******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* GONZALO DIAZ
## (SC 20720)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Alexander and Dannehy, Js.

*Syllabus*

Convicted of the crimes of felony murder, burglary in the first degree, conspiracy to commit burglary in the first degree, attempt to commit robbery in the first degree, and criminal possession of a firearm in connection with the shooting death of the victim, the defendant appealed to this court. At trial, one of the defendant's accomplices, D, testified pursuant to a cooperation agreement with the state. D testified that, on the night of the murder, she had driven her boyfriend, J, and J's friend, who allegedly was the defendant and went by the name "E," to the victim's house to buy drugs. Once they arrived, J informed D that they were going to rob the victim. D and E approached the house while J waited across the street. When the victim opened the door, E drew a gun and barged into the victim's house. D was scared and ran back to the car, where she met J. According to D, she heard a gunshot as she fled. The defendant testified in his own defense. Although he admitted that he went to the victim's house with J and D to buy drugs, he testified that he stayed near the car while J and D approached the house and that, after ten to fifteen minutes, he heard a gunshot. According to the defendant, J handed D a gun when J reentered the car. While cross-examining the defendant, the prosecutor indicated that a video recording of the defendant's interviews with the police, in which the defendant made certain statements that were inconsistent with his trial testimony, would be played at a later point in the trial. The video recordings, however, ultimately were not offered into evidence. During rebuttal argument, the prosecutor remarked on D's credibility, stating that either D or the defendant was "completely wrong" because their testimony was not consistent. The prosecutor also made remarks regarding the fact that the defendant, during his testimony, did not express outrage toward others who had implicated him or who had testified against him, and then proceeded to ask the jurors how they would feel if they were being accused of the crimes for which the defendant was being tried. The trial court issued a general credibility instruction that was applicable to all of the witnesses, an instruction applicable to accomplices that named D by name, and an instruction concerning the defendant's testimony in particular. The court specifically instructed the jurors to assess the defendant's credibility in the same manner as that of other witnesses and that they could consider "his interest in the verdict" in assessing his credibility. On appeal, the defendant claimed, for the first time, that the trial court had committed plain error by instructing the jury that it

could consider the defendant's interest in the outcome of the trial and that the prosecutor had made certain improper remarks during his cross-examination of the defendant and during rebuttal argument. *Held*:

1. The defendant could not prevail on his claim that the trial court had committed plain error by instructing the jury that it could consider his interest in the outcome of the trial in assessing the credibility of his trial testimony:

   In *State* v. *Medrano* (308 Conn. 604), this court exercised its supervisory authority over the administration of justice and directed trial courts to refrain from instructing the jury that, when a defendant testifies, it may specifically consider the defendant's interest in the outcome of the case and the importance to him of the outcome of the trial, and, although this court agreed, and the state conceded, that the trial court's instruction in the present case violated the directive in *Medrano* in an obvious and readily discernible manner, the defendant failed to demonstrate that the erroneous instruction resulted in manifest injustice.

   The fact that a trial court's jury instruction, by commission or omission, fails to comply with a supervisory rule does not, in and of itself, establish the existence of manifest injustice necessary for plain error, and, instead, the defendant must establish that the evidence adduced at trial, the disputed factual issues before the jury, and the instructions as a whole gave rise to the danger of juror misunderstanding or confusion that prompted the court to adopt the rule that the trial court failed to implement.

   In the present case, although the trial court included a sentence that improperly made a specific reference to the defendant's interest in the outcome of the trial, the erroneous instruction was brief and immediately preceded and followed by qualifying language, which the defendant did not challenge on appeal and which required the jury to evaluate the defendant's testimony as it would the testimony of any other witness, and, viewing the jury charge in its entirety, this court concluded that the erroneous instruction did not mislead the jury.

   Moreover, this court could not conclude that the erroneous jury instruction so affected the fairness and integrity of, and public confidence in, the judicial proceedings so as to require reversal of the judgment, as the jury was free to infer from the evidence presented at trial, including the defendant's admission that he traveled with J and D to the victim's home to purchase drugs from a known drug house and evidence that he was in that area at the time the victim was killed, that the defendant was a ready and willing participant in the criminal activity that resulted in the victim's death, and also to infer that the defendant's behavior following the crimes, particularly changing his cell phone number and lying to the police, was inconsistent with innocence and indicative of consciousness of guilt.

There was no merit to the defendant's contention that the erroneous instruction likely misled the jury by placing the defendant on equal footing with D for purposes of the jury's credibility determination, the trial court's instructions having carefully distinguished between the special credibility rules governing the testimony of an accomplice and the general credibility rules governing the testimony of all other witnesses who might have an interest in the outcome of the case, including the defendant, and the trial court explicitly informed the jury that the defendant's testimony should be assessed in accordance with its general credibility instruction governing the testimony of all other witnesses, whereas D's testimony was governed by the special credibility instruction unique to the testimony of accomplices.

2. There was no merit to the defendant's claim that the prosecutor had engaged in certain improprieties during his cross-examination of the defendant and during rebuttal argument because none of the prosecutor's remarks was improper:

a. The prosecutor did not improperly comment on D's credibility, during rebuttal argument, when he stated that either D or the defendant must be "wrong":

Contrary to the defendant's argument that the prosecutor's comment improperly implied that the jury could not find the defendant not guilty unless it found that D had lied, the prosecutor's isolated remark did not make a direct connection between the defendant's guilt and D's credibility or misrepresent the state's burden of proof.

Moreover, because D only identified her accomplices as J and E, and never identified the defendant as E, the jury was not required to find that D had lied in order to find the defendant not guilty of the charged crimes.

b. The prosecutor did not make an improper golden rule argument when, during rebuttal argument, he commented on the defendant's lack of outrage toward his accusers and asked the jurors how they would feel if they had been accused of the crimes for which the defendant was on trial:

The prosecutor's observation about the defendant's lack of outrage and his question to the jurors did not appeal to the jurors' passions or emotions but, instead, asked the jurors to use their common sense and experience to infer that an innocent person accused of the crimes charged would have exhibited some outrage or anger on the witness stand, and such an argument fell within the permissible bounds of fair comment on witness credibility.

c. The prosecutor did not argue facts not in evidence during his cross-examination of the defendant:

Certain questions the prosecutor asked the defendant about threats he allegedly made to D's son were not improper because those questions were designed to test the defendant's credibility and to rebut, impeach, modify, or explain the defendant's direct testimony, and the defendant did not claim that the prosecutor lacked a good faith basis to ask those questions or that the questions themselves or the information sought was inflammatory, inadmissible, unduly prejudicial, or in violation of a court order.

Moreover, the prosecutor's comments that allegedly inconsistent statements the defendant made during his video-recorded police interrogations would be played at a later point during the trial did not constitute improprieties, insofar as the jury was aware of the existence of the recordings and of the fact that many of the defendant's statements therein were inconsistent with his trial testimony, the defendant did not claim that the inconsistent statements were inadmissible for impeachment purposes or that the prosecutor lacked a good faith intent to play them at the time he made the challenged remarks, and the record did not reflect that the prosecutor's comments were delivered in a sarcastic, provocative, or aggressive manner.

Argued November 14, 2023—officially released April 9, 2024

*Procedural History*

Substitute information charging the defendant with the crimes of felony murder, manslaughter in the first degree with a firearm, burglary in the first degree, conspiracy to commit burglary in the first degree, attempt to commit robbery in the first degree, and criminal possession of a firearm, brought to the Superior Court in the judicial district of Waterbury, where the charges of felony murder, manslaughter in the first degree with a firearm, burglary in the first degree, conspiracy to commit burglary in the first degree, and attempt to commit robbery in the first degree were tried to the jury before *Schuman, J.*; verdict of guilty of felony murder, manslaughter in the first degree with a firearm, burglary in the first degree, conspiracy to commit burglary in the first degree, and attempt to commit robbery in the first degree; thereafter, the charge of criminal possession of a firearm was tried to the court; finding of guilty; subsequently, the court vacated the conviction as to manslaughter in the first degree with a firearm

and rendered judgment of guilty of felony murder, burglary in the first degree, conspiracy to commit burglary in the first degree, attempt to commit robbery in the first degree, and criminal possession of a firearm, from which the defendant appealed to this court. *Affirmed.*

*Shanna P. Hugle*, deputy assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Maureen Platt*, state's attorney, and *Don E. Therkildsen* and *Amy Sedensky*, supervisory assistant state's attorneys, for the appellee (state).

*Opinion*

ECKER, J. In this direct appeal,[1] the defendant, Gonzalo Diaz, raises two unpreserved claims challenging his conviction of felony murder, burglary in the first degree, conspiracy to commit burglary in the first degree, attempt to commit robbery in the first degree, and criminal possession of a firearm. First, he claims that the trial court committed plain error when it instructed the jury that it may consider his interest in the outcome of its verdict when assessing the credibility of his trial testimony, contrary to our statement in *State* v. *Medrano*, 308 Conn. 604, 631, 65 A.3d 503 (2013), that such an instruction should not be given. Second, he claims that the prosecutor made improper remarks during cross-examination and rebuttal argument, in violation of his due process right to a fair trial. We affirm the trial court's judgment.

The jury reasonably could have found the following facts. The victim, Denise Rogers-Rollins, and her son sold drugs out of their home on Wall Street in Waterbury. During the early morning hours of December 7, 2019, the victim was shot and killed in her home. The

---

[1] See General Statutes § 51-199 (b) (3).

police investigation into the victim's death led to the questioning of Shavonnah Draper, whose car was spotted parked nearby at the time of the shooting. Draper initially lied to the police regarding her involvement in the crimes but later admitted that she drove her boyfriend, Howard Jefferson, and his friend, E, from Bridgeport to the victim's residence on Wall Street in Waterbury to buy drugs on the night of the shooting. Pursuant to Jefferson's instructions, Draper did not park in front of the victim's home but, instead, parked nearby on Shelley Street. When Draper, Jefferson, and E exited the vehicle, Jefferson informed Draper that they "were going to rob the place, and [Draper was going to be] the one to get the door open." Draper participated in the planned robbery because she was afraid of Jefferson, who regularly abused her physically.

Draper and E approached the victim's residence while Jefferson waited across the street. Draper knocked on the door, and the victim asked who was there. Draper answered: "[I]t's me." The victim asked Draper if she had called beforehand, and Draper responded that there had been "no answer." When the victim opened the door, E pulled out "a dark colored gun" and "bum-rushe[d] her" inside. Scared, Draper ran back to the car, where she met Jefferson. Draper heard the victim screaming and the sound of a gunshot as she ran to the car. Draper entered the driver's seat of her vehicle, and Jefferson got into the passenger's seat. Draper started the car and turned around to proceed down Shelley Street away from Wall Street. As she was driving away, Draper saw E walking down Shelley Street. Jefferson instructed Draper to pick up E, and Draper complied. After E entered the car, Jefferson asked E, "[w]hat the fuck happened?" E replied, "I don't know. I don't know. I hit her, and [the gun] went off." Draper drove back to Bridgeport and dropped E off near State Street and Lee Avenue.

The defendant was interviewed by the police twice, once on December 20, 2019, and again on January 7, 2020. During his first interview, the defendant identified himself as E after viewing video surveillance footage depicting Jefferson and E near Wall Street on the night of the victim's death. The defendant subsequently was arrested and charged in a six count substitute information with (1) manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a (a), (2) felony murder in violation of General Statutes § 53a-54c, (3) burglary in the first degree in violation of General Statutes §§ 53a-8 and 53a-101 (a) (3), (4) conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-48 and 53a-101 (a) (3), (5) attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-134 (a) (2), and (6) criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1). The defendant elected a jury trial on the first five counts and a bench trial on the sixth count.

Testifying at trial pursuant to a cooperation agreement, Draper provided a version of events consistent with the facts set forth in the preceding paragraphs. She acknowledged that she had been unable to identify the defendant as E from a photographic array conducted shortly after the incident, and she never identified the defendant as E at trial.

The defendant testified in his own defense. He admitted that, on the night of the shooting, he traveled from Bridgeport to Waterbury with Jefferson and Draper to buy drugs, but he denied any knowledge of, or involvement in, the attempted robbery, burglary, and killing of the victim. According to the defendant, Draper parked her car on Shelley Street, and he, Jefferson, and Draper exited the vehicle. Jefferson informed the defendant that "he had to take care of something. He [was] going to this trap house, [where] he [knew] this lady that lives

there that use[s] drugs . . . and her son sell[s] drugs.”[2] The defendant stayed with the car and smoked a cigarette while Jefferson and Draper went to the trap house on Wall Street.

The defendant testified that, after waiting by the car for approximately ten to fifteen minutes, he heard a gunshot. He walked to the corner of Wall and Shelley Streets and looked around but did not see anything. He then walked back to the car, only to discover that it was locked. The defendant returned to the corner of Wall and Shelley Streets, where he saw Draper walking down the street with Jefferson following fifteen to twenty feet behind her. Draper reached the car and got into the driver’s seat, and the defendant sat in the back. Jefferson waved Draper along and kept walking down Shelley Street in the opposite direction. Draper turned the car around and drove down Shelley Street, where she picked up Jefferson. Jefferson entered the front passenger seat of the vehicle and handed Draper “a small, black,” semiautomatic gun, which Draper placed in the center console.

According to the defendant’s testimony, he “could see a cop car coming” and heard sirens as Draper was driving away. Although it was “obvious something [had] happened,” the defendant did not ask Draper and Jefferson what had occurred because he “didn’t want to be involved.” Draper drove back to Bridgeport, where she dropped the defendant off near State Street and Lee Avenue.

The defendant acknowledged that he had changed his cell phone number approximately one week after the death of the victim. He said that he did so because Draper had been arrested, Jefferson had stopped communicating with him, and he “felt like [he] was being

---

[2] The defendant testified that a trap house is “[a] place that sells drugs.”

set up." The defendant therefore "cut [his] ties with [Jefferson]."

The defendant also admitted that he had lied to the police multiple times during the two interviews regarding the incident. The defendant initially told the police that, on the night of the victim's death, he had traveled from Bridgeport to Waterbury with "one of [his] boys" and denied going to the Wall Street area. Additionally, the defendant initially informed the police that, although he had met up with Jefferson in Waterbury that night, it was just the two of them, and no one else had joined them. When the police advised the defendant that they had video surveillance footage of him in a car with Jefferson and Draper, the defendant admitted that he had gone back to Bridgeport with Jefferson and Draper but still denied traveling to Waterbury with them. The defendant also originally denied going to the Wall Street area with Jefferson and Draper, informing the police that the couple had left him "for [one-half] hour to forty-five minutes when they went somewhere." Later, the defendant admitted to the police that he had traveled to Waterbury with Jefferson and Draper and went with them to the Wall Street area but denied ever exiting the car, adamantly stating that he was "positive" that he "stayed in the car the whole time . . . ." When informed by the police that there were eyewitnesses who saw three people exiting Draper's car on Shelley Street,[3] the defendant changed his story and stated that he got out of the car on Shelley Street, but only to smoke a cigarette.

On the basis of the foregoing evidence, the jury found the defendant guilty of felony murder, manslaughter in the first degree with a firearm, burglary in the first

---

[3] Although there was an eyewitness who testified that she saw three or four individuals returning to a gray car parked at the corner of Wall and Shelley Streets after the shooting, no eyewitness testified regarding who exited the gray car after it first parked on Shelley Street.

degree, conspiracy to commit burglary in the first degree, and attempt to commit robbery in the first degree, while the trial court found him guilty of criminal possession of a firearm. At sentencing, the trial court vacated the defendant's manslaughter conviction but otherwise rendered judgment in accordance with the jury's verdict and the court's finding.[4] The trial court sentenced the defendant to a total effective sentence of forty-five years of imprisonment,[5] and this direct appeal followed.

I

The defendant claims that the trial court committed plain error by instructing the jury that, in assessing the credibility of his trial testimony, it "necessarily [could consider] his interest in the verdict that [it] will [return]." The state concedes that this instruction plainly was erroneous in light of *State* v. *Medrano*, supra, 308 Conn. 604, in which we "exercise[d] . . . our supervisory authority over the administration of justice . . . [to] direct our trial courts in the future to refrain from instructing jurors, when a defendant testifies, that they may specifically consider the defendant's interest in the outcome of the case and the importance to him of

---

[4] With the agreement of the defendant, the state moved to vacate the defendant's manslaughter conviction because there was only one homicide, and it would violate the defendant's right to be free from double jeopardy to convict the defendant of both felony murder and manslaughter in the first degree with a firearm. The trial court granted the state's motion and vacated the defendant's manslaughter conviction without prejudice to reinstatement if his felony murder conviction is reversed or vacated on appeal.

[5] The trial court sentenced the defendant to forty years of imprisonment for the crime of felony murder and imposed the following concurrent sentences: twenty years of imprisonment for burglary in the first degree, twenty years of imprisonment for conspiracy to commit burglary in the first degree, and twenty years of imprisonment for attempt to commit robbery in the first degree. Additionally, the trial court sentenced the defendant to five years of imprisonment for the crime of criminal possession of a firearm, to run consecutively to the other sentences, for a total effective sentence of forty-five years of imprisonment.

the outcome of the trial." Id., 631. The state contends, however, that the defendant's claim fails under the second prong of the plain error test because the defendant has failed to demonstrate that the erroneous instruction resulted in manifest injustice. We agree.

The following additional information regarding the trial court's jury instructions is relevant to our resolution of this claim. The trial court instructed the jury as follows with respect to the defendant's testimony in particular: "In this case, the defendant testified. An accused person having taken the stand, [he] stands before you like any other witness. He is entitled to the same considerations and must have his testimony tested and measured by you by the same factors and standards as you would judge the testimony of any other witness. *That necessarily involves consideration of his interest in the verdict that you will render.* Of course, you have no right to disregard his testimony, or to disbelieve his testimony, merely because he is accused of a crime. You will consider my earlier instructions on the general subject matter of credibility that obviously pertain to the defendant's testimony, as well as the testimony of any other witness."[6] (Emphasis added.)

In its general instructions on witness credibility, the trial court informed the jury that, in ascertaining the facts, "you must decide which testimony to believe and which testimony not to believe. You may believe all, none, or any part of any witness' testimony. In making that decision, you may take into account a number of factors, including the following: (1) Was the witness able to see, or hear, or know the things about which that witness testified? (2) How well was the witness able to recall and describe those things? (3) What was the witness' manner while testifying? (4) Did the wit-

---

[6] The defendant challenges only the italicized portion of the trial court's jury charge.

ness have an interest in the outcome of this case, or any bias, or prejudice concerning any party or any manner involved in the case? (5) How reasonable was the witness' testimony considered in light of all the evidence in the case? And (6) was the witness' testimony contradicted by what that witness has said, or done, at another time, or by the testimony of other witnesses, or by other evidence? Of course, you should use your common sense and good judgment in applying these factors."

This instruction continued: "In deciding whether or not to believe a witness, keep in mind that people sometimes forget things. You need to consider, therefore, whether a contradiction is an innocent lapse of memory or an intentional falsehood, and that may depend on whether it has to do with an important fact or with only a small detail. Remember, also, that it is not uncommon for two honest people to witness the same event yet perceive or recall things differently. If you should think that a witness has deliberately testified falsely in some respect, you should carefully consider whether you should . . . rely [on] any or all of the remainder of his or her testimony. These are some of the factors you may consider in whether to believe testimony."

The trial court also instructed the jury regarding the law governing certain specified categories of witnesses, including police officers, expert witnesses, and accomplices. With respect to the latter category of witnesses, the trial court identified the defendant's alleged accomplice, Draper, by name and informed the jury that, "[i]n weighing the testimony of . . . Draper, you should consider the fact that she is facing charges as an accomplice to the crimes charged in this case. It may be that you would not believe a person who has committed a crime as readily as you would believe a person of good character. In weighing the testimony of an accomplice who has not yet been sentenced or whose case has not yet been disposed of, you should keep in mind that she

may, in her own mind, be looking for some favorable treatment in the sentence or disposition of her own case; therefore, she may have such an interest in the outcome of this case that her testimony may have been colored by that fact. Therefore, you must look with particular care at the testimony of an accomplice and scrutinize it very carefully before you accept it. You should also bear in mind, however, that there are many offenses that are of such a character that . . . the only persons capable of giving useful testimony are those who are, themselves, implicated in the crime. It is for you to decide what credibility you will give to an accomplice and whether you will believe or disbelieve the testimony of a person who by her own admission has committed or contributed to the crimes charged by the state here. Like all other questions of credibility, this is a question you must decide based on all the evidence presented to you."

Defense counsel did not object to the trial court's instruction regarding consideration of the defendant's interest in the outcome of the trial. On appeal, the defendant now claims for the first time that this instruction constitutes plain error. To prevail on this unpreserved claim, the defendant must satisfy the two-pronged plain error test. First, the defendant must establish that "there was an obvious and readily discernable error . . . ." (Internal quotation marks omitted.) *State* v. *Blaine*, 334 Conn. 298, 306, 221 A.3d 798 (2019). Second, the defendant must establish that the obvious and readily discernable "error was so harmful or prejudicial that it resulted in manifest injustice." (Internal quotation marks omitted.) Id. In sum, reversal is required only if the alleged error is "*both* so clear *and* so harmful" that it affects the fairness and integrity of and public confidence in the judicial proceedings. (Emphasis in original; internal quotation marks omitted.) *State* v. *Sanchez*, 308 Conn. 64, 78, 60 A.3d 271

(2013); see also *State* v. *McClain*, 324 Conn. 802, 812, 155 A.3d 209 (2017) ("plain error . . . is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings" (internal quotation marks omitted)).

The defendant's plain error claim rests on the fact that the challenged portion of the charge violated this court's clear directive in *State* v. *Medrano*, supra, 308 Conn. 604. The trial court in *Medrano* gave a jury instruction similar to the one under consideration in this case, informing the jury that, in assessing the testimony of the defendant, Rafael Medrano, the jury could "consider the importance to him of the outcome of the trial." (Internal quotation marks omitted.) Id., 624. On appeal, Medrano claimed for the first time that the trial court's instruction undermined the presumption of his innocence and deprived him of his due process right to a fair trial. Id., 622. We concluded that Medrano's unpreserved constitutional claim was reviewable under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), but that no constitutional violation occurred pursuant to *State* v. *Williams*, 220 Conn. 385, 397, 599 A.2d 1053 (1991), in which we held that a comparable instruction emphasizing a defendant's interest in the outcome of the trial and the need to evaluate the defendant's testimony in the same fashion as the testimony of other witnesses was not unduly repetitive and did not overstep the bounds of evenhandedness. See *State* v. *Medrano*, supra, 622–26. Because the trial court's instruction did not dilute the presumption of innocence or deprive Medrano of a fair and just trial, his claim failed under *Golding*. See id., 630–31.

Although we affirmed Medrano's conviction, we expressed concern "that instructions regarding the defendant's interest in the outcome of a case, when viewed in isolation from the qualifying language concerning evaluating

the defendant's credibility in the same manner as the testimony of other witnesses, could give rise to a danger of juror misunderstanding." Id., 629–30. We therefore exercised our supervisory authority over the administration of justice prospectively to "direct our trial courts in the future to refrain from instructing jurors, when a defendant testifies, that they may specifically consider the defendant's interest in the outcome of the case and the importance to him of the outcome of the trial. Instead, we instruct[ed] the trial courts to use the general credibility instruction to apply to a criminal defendant who testifies." Id., 631.

The state concedes that, pursuant to *Medrano*, the first prong of the plain error test is satisfied in the present case because the trial court erred in giving the challenged instruction regarding the defendant's interest in the outcome of the trial, and the error was plain, in the sense that it was patent, readily discernable, obvious, and not debatable. See, e.g., *State* v. *Jamison*, 320 Conn. 589, 596, 134 A.3d 560 (2016). We agree and pause to repeat the mandatory directive issued in *Medrano*: a trial court's jury charge must not single out a criminal defendant's testimony for special treatment based on the defendant's interest in the result of the jury's verdict or the importance to him of the outcome of the trial.

The remaining issue is whether the error resulted in manifest injustice. The fact that a trial court's jury instruction, by commission or omission, fails to comply with a rule issued pursuant to our supervisory authority "does not, in and of itself, establish the existence of manifest injustice necessary for plain error." *State* v. *Sanchez*, supra, 308 Conn. 83; see id., 82–87 (trial court's failure to issue eyewitness identification instruction contrary to supervisory rule adopted in *State* v. *Ledbetter*, 275 Conn. 534, 575, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006),

did not result in manifest injustice); see also *State* v. *Smith*, 275 Conn. 205, 237, 239–40, 881 A.2d 160 (2005) (erroneous jury instruction on intent to cause death contrary to supervisory rule adopted in *State* v. *Aponte*, 259 Conn. 512, 522, 790 A.2d 457 (2002), did not result in manifest injustice); *State* v. *Nims*, 70 Conn. App. 378, 385, 797 A.2d 1174 (jury instruction on ingenuity of counsel contrary to supervisory rule adopted in *State* v. *Delvalle*, 250 Conn. 466, 475–76, 736 A.2d 125 (1999), did not affect "the fairness and integrity of the proceedings" or result in "manifest injustice"), cert. denied, 261 Conn. 920, 806 A.2d 1056 (2002). To prove manifest injustice, the defendant must establish that the evidence adduced at trial, the disputed factual issues before the jury, and the instructions as a whole actually gave rise, in the particular case under review, to the danger of juror misunderstanding or confusion that prompted the court to adopt the rule that the trial court failed to implement. See, e.g., *State* v. *Sanchez*, supra, 82–84.

Reviewing the trial court's charge in its entirety, we conclude that the defendant has failed to establish that the erroneous instruction resulted in manifest injustice. Although the trial court included a sentence in its charge that improperly made a specific reference to the defendant's interest in the outcome of the trial, it also instructed the jury in clear and direct terms that the jury's assessment of the defendant's testimony must be "tested and measured . . . by the same factors and standards as you would judge the testimony of any other witness." The trial court cautioned the jury that it had "no right to disregard [the defendant's] testimony, or to disbelieve his testimony, merely because he is accused of a crime" and directed the jury specifically to consider its "earlier instructions on the general subject matter of credibility that obviously pertain to the defendant's testimony, as well as the testimony of any other witness." Those earlier instructions on general credibil-

ity permitted the jury to consider whether any witness (which, as the trial court later explained, included the defendant) "[had] an interest in the outcome of this case, or any bias, or prejudice concerning any party or any manner involved in the case . . . ." Because the erroneous instruction was brief and immediately preceded and followed by qualifying language that is not challenged by the defendant on appeal requiring the jury to evaluate the defendant's testimony as it would the testimony of any other witness, we are confident that the jury was not misled.[7]

Our conclusion in this regard is reinforced by the evidence adduced at trial, which established that the defendant traveled from Bridgeport with Jefferson and Draper to purchase drugs in Waterbury and was in the vicinity of the victim's home on Wall Street, a known drug house, when the victim was shot and killed. The defendant did not dispute that he was with Draper and Jefferson near Wall Street at the time of the attempted robbery, burglary, and killing of the victim but testified

---

[7] To support his claim to the contrary, the defendant relies on *United States* v. *Solano*, 966 F.3d 184, 186, 193 (2d Cir. 2020), in which the Second Circuit Court of Appeals held that it was plain error to instruct a jury that a defendant's interest in the outcome of the trial created a motive to testify falsely. In arriving at its conclusion, the Second Circuit relied on its prior case law—including *United States* v. *Gaines*, 457 F.3d 238 (2d Cir. 2006), and *United States* v. *Brutus*, 505 F.3d 80 (2d Cir. 2007)—in which it expressly " 'denounce[d] any instruction . . . that tells a jury that a testifying defendant's interest in the outcome of the case creates a motive to testify falsely' " because, among other reasons, " 'a defendant does not always have a motive to testify falsely. An innocent defendant has a motive to testify truthfully.' " (Emphasis omitted.) *United States* v. *Solano*, supra, 194, quoting *United States* v. *Gaines*, supra, 246. In *Medrano*, we found *Gaines* and *Brutus* to be distinguishable because the trial court did not "explicitly [state] that [Medrano's] interest in the case gave him a motivation to testify falsely." *State* v. *Medrano*, supra, 308 Conn. 629. Likewise, in the present case, the erroneous instruction did not inform the jury that the defendant's interest in the outcome of the trial created a motive to testify falsely. The instruction at issue, read as a whole, directed the jury to assess the defendant's testimony as it would that of any other witness. Accordingly, the defendant's reliance on *Solano* is misplaced.

that he had no knowledge of or involvement in those crimes. Despite the defendant's testimony, the jury was free to infer that he was a ready and willing participant in the criminal activity that resulted in the victim's death. See *State* v. *Patrick M.*, 344 Conn. 565, 576, 280 A.3d 461 (2022) ("[t]he jury is permitted to rely on its common sense, experience and knowledge of human nature in drawing inferences . . . and may draw factual inferences on the basis of already inferred facts" (internal quotation marks omitted)). Additionally, the defendant's behavior following the crimes, particularly changing his cell phone number and lying to the police, was inconsistent with innocence and indicative of consciousness of guilt. See, e.g., *State* v. *Turner*, 181 Conn. App. 535, 564, 187 A.3d 454 (2018) (evidence that, after crime was committed, defendant changed his cell phone number, evaded police, and lied about his identity supported inference of consciousness of guilt), aff'd, 334 Conn. 660, 224 A.3d 129 (2020). On the present factual record, we cannot conclude that the erroneous jury instruction "so affected the fairness and integrity of and public confidence in the judicial proceedings as to require reversal of the judgment." *State* v. *Sanchez*, supra, 308 Conn. 84; see also *State* v. *Kyle A.*, 348 Conn. 437, 450–51, 307 A.3d 249 (2024) (in reviewing jury instruction for plain error, court must evaluate evidence adduced at trial to determine whether manifest injustice occurred).

The defendant contends that the erroneous instruction likely misled the jury because it placed the defendant on equal footing with Draper for purposes of the jury's determination of credibility. To the contrary, the trial court explicitly informed the jury that the defendant's testimony should be assessed in accordance with its general credibility instruction governing the testimony of all other witnesses, whereas Draper's testimony was governed by the special credibility instruction

unique to the testimony of accomplices. Indeed, the trial court specifically informed the jury that it had "no right to disregard [the defendant's] testimony, or to disbelieve his testimony, merely because he is accused of a crime." Draper, in contrast, had confessed to her involvement in the crimes and was "facing charges as an accomplice," and the trial court accordingly instructed the jury that it might not believe her testimony "as readily as [it] would believe a person of good character." The trial court tailored its accomplice instruction to the specific risk posed by accomplice testimony, explaining that an accomplice like Draper, "who has not yet been sentenced or whose case has not yet been disposed of . . . [may] be looking for some favorable treatment in the sentence or disposition of her own case," and, therefore, accomplice testimony must be examined "with particular care . . . and scrutinize[d] . . . very carefully" before it is accepted. The trial court's instructions thus carefully distinguished between the special credibility rules governing the testimony of an accomplice and the general credibility rules governing the testimony of all other witnesses who might have an interest in the outcome of the case, including the defendant. We have no reason to think that the trial court's erroneous instruction resulted in manifest injustice necessitating the reversal of the defendant's conviction.

## II

The defendant claims on appeal, for the first time, that the prosecutor committed multiple improprieties during his cross-examination of the defendant and during rebuttal argument,[8] which deprived the defendant

---

[8] We observe that the prosecutor's closing argument was extremely brief and that he reserved the bulk of his time for rebuttal. No claim of error is raised with respect to this tactic, but we repeat the concern that we articulated in *State* v. *Gonzalez*, 338 Conn. 108, 257 A.3d 283 (2021): "Prosecutors should avoid structuring their closing arguments in a manner that reserves the entirety of their summation for rebuttal, which could implicate a defendant's constitutional rights. Of course, under such circumstances, trial judges have discretion and are in the best position to fashion an appropriate remedy,

of his constitutional right to a fair trial. Specifically, the defendant contends that the prosecutor improperly (1) commented on Draper's credibility, (2) appealed to the jurors' emotions, and (3) argued facts not in evidence. The state responds that the defendant's claims are unreviewable because the alleged improprieties that occurred during cross-examination are unpreserved evidentiary claims and the alleged improprieties that occurred during rebuttal argument were waived.[9] Alternatively, the state argues that the prosecutor's remarks were not improper and, even if improper, did not deprive the defendant of a fair trial. We need not decide whether the defendant's prosecutorial impropriety claims are unpreserved evidentiary claims, or whether they were waived, because we agree with the state that none of the prosecutor's remarks was improper. See, e.g., *State*

including providing the defendant with an opportunity to make additional closing arguments to the jury." Id., 141 n.20.

[9] The state does not dispute that unpreserved prosecutorial impropriety claims alleging the violation of a defendant's due process right to a fair trial generally are reviewable even when raised for the first time on appeal. See, e.g., *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004). The state claims, however, that defense counsel affirmatively waived any challenge to the alleged improprieties committed during rebuttal argument because, after completing his argument, the prosecutor asked in open court whether the trial court or defense counsel had "any objections to any of [his] statements in closing," and defense counsel responded that she "did not have any objections . . . [but] would have expressed them." With respect to the alleged improprieties that occurred during cross-examination, the state, quoting *State* v. *Graham*, 344 Conn. 825, 857, 282 A.3d 435 (2022), contends that the defendant's claims are "nothing other than unpreserved and unreviewable evidentiary issues" because " ' "[s]imply posing an objectionable question does not amount to an actionable impropriety." ' " See id., 858 (declining to address "an unpreserved evidentiary claim masquerading as a claim of prosecutorial impropriety").

Although we need not address the merits of the state's waiver claim, we note that, to the extent that a prosecutor has a concern or question about the propriety of any remarks made during closing and rebuttal arguments, the proper procedure is to identify the area of concern and to ask the trial court to inquire of defense counsel whether he or she wishes to be heard on that particular issue. This procedure avoids any appearance, after the fact, that the prosecutor may have been seeking to solicit a blanket waiver of any claims of alleged impropriety.

v. *Michael T.*, 338 Conn. 705, 718–19, 259 A.3d 617 (2021) (declining to decide whether defendant's claim was prosecutorial impropriety claim or unpreserved evidentiary claim because challenged remark was not improper); *State* v. *Wilson*, 111 Conn. App. 614, 631 and n.8, 960 A.2d 1056 (2008) (declining to decide whether defendant's prosecutorial impropriety claim was waived because prosecutor's remark was not improper), cert. denied, 290 Conn. 917, 966 A.2d 234 (2009).

It is well established that "[p]rosecutorial impropriety can occur during both the cross-examination of witnesses and in the course of closing or rebuttal argument." *State* v. *Long*, 293 Conn. 31, 37, 975 A.2d 660 (2009). "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process." (Internal quotation marks omitted.) *State* v. *Courtney G.*, 339 Conn. 328, 340, 260 A.3d 1152 (2021). First, we examine whether an impropriety occurred. Id. If the prosecutor's remarks were improper, then we move on to the second step and examine whether the impropriety deprived the defendant of his constitutional right to a fair trial. Id. "[T]he burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Internal quotation marks omitted.) Id.

A

We first address whether the prosecutor improperly commented on Draper's credibility during rebuttal by arguing that "[s]omeone is completely wrong, either . . . Draper or [the defendant], because both events don't line up."[10] The defendant claims that this comment

___

[10] The defendant also claims that the prosecutor improperly expressed his own personal opinion on Draper's credibility when he stated, "[*i*]*f you believe* [*Draper's*] *testimony*, she's the least culpable person, she's the most credible and least culpable person in this [case]." (Emphasis added.) This claim lacks merit because the prosecutor was not expressing his personal opinion on Draper's credibility. Instead, the prosecutor explicitly condi-

violated the rule set forth in *State* v. *Singh*, 259 Conn. 693, 712, 793 A.2d 226 (2002), because it implied that the jury could not find the defendant not guilty unless it found that Draper had lied. We do not agree.

In *Singh*, we held that it is improper for a prosecutor essentially to argue during closing that, "in order to find the defendant not guilty, the jury must find that witnesses had lied . . . ." Id., 712. We explained that "[t]he reason for this restriction is that [t]his form of argument . . . involves a distortion of the government's burden of proof" and "preclude[s] the possibility that the witness' testimony conflicts with that of the defendant for a reason other than deceit." (Internal quotation marks omitted.) Id., 709–10. We later held, in *State* v. *Albino*, 312 Conn. 763, 97 A.3d 478 (2014), that, in closing argument, there is a distinction between characterizing a witness' testimony as a lie and characterizing it simply as wrong. "[W]hen the prosecutor argues that the jury must conclude that one of two versions of directly conflicting testimony must be wrong, the state is leaving it to the jury to make that assessment [of the witness' veracity]. . . . [B]y framing the argument in such a manner, the jury is free to conclude that the conflict exists due to mistake (misperception or misrecollection) or deliberate fabrication." Id., 787. Nonetheless, the mere "use of the term 'wrong' instead of 'lying' " will not always be proper if the prosecutor's " 'closing arguments provid[e], *in essence*, that in order to find the defendant not guilty, the jury must find that witnesses had lied . . . .' " (Emphasis in original.) Id., quoting *State* v. *Singh*, supra, 259 Conn. 712.

The prosecutor's isolated remark did not make a direct connection between the defendant's guilt and

tioned his observations about relative culpability on the jury's decision whether to believe Draper's testimony. See, e.g., *State* v. *Ciullo*, 314 Conn. 28, 41, 100 A.3d 779 (2014) ("[a] prosecutor's mere use of the words 'honest,' 'credible,' or 'truthful' does not, per se, establish prosecutorial impropriety").

Draper's credibility; nor did it misrepresent the state's burden of proof. See *State* v. *Albino*, supra, 312 Conn. 788. Notably, Draper was unable to identify the defendant as E, the individual who "bum-rushe[d]" the victim with a gun and committed the charged crimes, and the jury was informed of that fact on more than one occasion. Given that Draper never identified the defendant as her accomplice, the jury was not required to find that Draper had lied to find the defendant not guilty. See *State* v. *Pjura*, 200 Conn. App. 802, 830, 240 A.3d 772 ("[T]he prosecutor's comments . . . did not implicate a core justification for the *Singh* rule because they did not force the jury to find the defendant not guilty only if it first concluded that the other witnesses had lied. . . . The jury . . . could have found the defendant guilty on the basis of his testimony alone."), cert. denied, 335 Conn. 977, 241 A.3d 131 (2020); *State* v. *McCoy*, 171 Conn. App. 311, 320, 157 A.3d 97 (2017) (prosecutor's argument that, "in order for the jurors to find that [a witness] had received a secret plea deal, they would need to find that several of the other witnesses had lied" was not improper under *Singh* because it "did not improperly present the jury with a choice between believing the state's witnesses and [finding] the defendant [not guilty]"), rev'd in part on other grounds, 331 Conn. 561, 206 A.3d 725 (2019). We therefore conclude that the challenged remark was not improper.

B

The defendant contends that the prosecutor's remarks regarding the defendant's testimonial demeanor constituted an improper golden rule argument. The prosecutor argued: "Consider, if only this, when he testified, I'm only talking about his testimony, his demeanor on the stand, his appearance on the stand. Was he outraged? Was he mad at Draper? Was he outraged people were saying these things about him? Nah. Kind of matter

of fact. . . . Any outrage? How would you feel if you were there being accused of this? Would you be upset? Be mad? Or just, ah, it happens?" We reject this claim.

A golden rule argument "urges jurors to put themselves in a particular party's place . . . or into a particular party's shoes. . . . Such arguments are improper because they encourage the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." (Internal quotation marks omitted.) *State* v. *Long*, supra, 293 Conn. 53–54. The principle underlying the prohibition on golden rule arguments is that jurors must "decide cases on the basis of the facts as they find them, and reasonable inferences drawn from those facts, rather than by any incitement to act out of passion or sympathy for or against any party" by imagining themselves as a party in the case. Id., 57–58.

As with many questions involving the propriety of arguments to the jury, the precise boundaries of fair play are not always easily articulated. "[N]ot all arguments that ask jurors to place themselves in a particular party's situation implicate the prohibition on golden rule argument[s]." (Internal quotation marks omitted.) *State* v. *Williams*, 172 Conn. App. 820, 839, 162 A.3d 84, cert. denied, 326 Conn. 913, 173 A.3d 389 (2017). The appellate courts of this state "repeatedly [have] held that a prosecutor does not violate the golden rule by using the pronoun 'you' or by asking the jurors to place themselves in the position of the witness if the prosecutor is using these rhetorical devices to ask the jury to assess the evidence from the standpoint of a reasonable person or to employ common sense in evaluating the evidence." Id., 839–40; see, e.g., *State* v. *Long*, supra, 293 Conn. 58 (prosecutor did not make improper golden rule argument because his remarks "were not intended to unduly arouse the jurors' emotions or to elicit the jurors' sympathies; rather, they were intended

to encourage the jurors to draw inferences from the evidence of [the victim's] actions that were presented at trial on the basis of the jurors' views as to how a reasonable [person] would act under the circumstances"); *State* v. *Bell*, 283 Conn. 748, 773, 931 A.2d 198 (2007) (same).

We conclude that the prosecutor's argument did not appeal to the jurors' passions or emotions but, instead, asked the jurors to use their common sense and experience to infer that an innocent man accused of the crimes charged would have exhibited some outrage or anger on the witness stand. Such an argument falls "within the permissible bounds of fair comment on witness credibility." *State* v. *Courtney G.*, supra, 339 Conn. 345 n.7; see id., 347–48 (prosecutor's comment on defendant's testimonial demeanor and " 'lack of outrage' " on witness stand was not improper because prosecutor "implicitly urged the jurors to infer, on the basis of their common sense and experience, that an innocent man falsely accused of sexually assaulting a child would have exhibited outrage while testifying").[11]

C

Lastly, the defendant claims that the prosecutor improperly referred to facts not in evidence during cross-exam-

[11] The defendant argues that a prosecutor's reliance on a criminal defendant's testimonial demeanor is problematic because it invites the "jury to depart from neutrality and emotionally assess [a defendant's] credibility and culpability based on what [it considers] to be [a] normal" reaction to an allegation of criminal conduct. (Emphasis omitted.) The dilemma faced by testifying defendants of color is particularly acute, the defendant argues, because such defendants are subject to an attack on their credibility if they appear overly calm on the witness stand but may also feed "into biases that persons of color are usually more aggressive" if they appear to be outraged. The defendant does not ask us, however, to reconsider and overrule our case law holding that a prosecutor properly may comment on a criminal defendant's testimonial demeanor. See, e.g., *State* v. *Courtney G.*, supra, 339 Conn. 348; *State* v. *Luster*, 279 Conn. 414, 440, 902 A.2d 636 (2006); *State* v. *Dupigney*, 78 Conn. App. 111, 124–25, 826 A.2d 241, cert. denied, 266 Conn. 919, 837 A.2d 801 (2003). We reject the defendant's argument in light of this unchallenged precedent.

ination when he asked the defendant questions about threats the defendant allegedly made to Draper's son[12] and commented that allegedly inconsistent statements made during the defendant's video-recorded police interrogations would be played later.[13] We find no merit to these claims on this record.

The defendant's challenge to the prosecutor's questions fails because it is entirely appropriate to ask properly phrased questions on cross-examination that relate to the credibility of a criminal defendant's direct testimony, even if those questions exceed the scope of the questioning on direct examination and refer to facts

[12] During the prosecutor's cross-examination of the defendant, the following colloquy took place:

"[The Prosecutor]: Have you ever met at a parking lot? You remember you told [Jefferson] to keep his girl's mouth shut?

"[The Defendant]: Never.

"[The Prosecutor]: Never? You never threatened [Draper's] son . . . ? You know where [her son] goes to school?

"[The Defendant]: No, I don't.

"[The Prosecutor]: [Do] you remember telling . . . Jefferson that?

"[The Defendant]: Nope."

[13] During the prosecutor's cross-examination of the defendant, the prosecutor asked about alleged inconsistencies between the defendant's trial testimony and his video-recorded interrogations with the police:

"[The Prosecutor]: And you said [Jefferson and Draper] both got in the car?

"[The Defendant]: I don't remember saying that.

"[The Prosecutor]: But you could have said it?

"[The Defendant]: Maybe, yeah.

"[The Prosecutor]: Okay. *We'll play it out later.*

* * *

"[The Prosecutor]: Didn't you tell [the police] later on you saw [Jefferson] getting out of the car with a gun?

"[The Defendant]: I assumed he got out with a gun in his hand.

"[The Prosecutor]: You said you saw it in the waistband, sir. You recall that?

"[The Defendant]: I don't recall that.

"[The Prosecutor]: *I'll play that for you, too.*

* * *

"[The Prosecutor]: You told the police you saw him get out of the car with a gun on Wall Street, correct? In his waistband?

"[The Defendant]: I never said that. I don't recall saying that.

"[The Prosecutor]: Okay. *We'll play that for you.* You don't recall that?

"[The Defendant]: No." (Emphasis added.)

not in evidence. See *State* v. *Sharpe*, 195 Conn. 651, 657, 491 A.2d 345 (1985). A cross-examiner may ask questions that are "designed to rebut, impeach, modify, or explain any of the defendant's direct testimony"; (internal quotation marks omitted) id.; "if he or she has a good faith belief that a factual predicate for the question exists." *State* v. *Barnes*, 232 Conn. 740, 747, 657 A.2d 611 (1995); see also *State* v. *Annulli*, 309 Conn. 482, 492, 71 A.3d 530 (2013) ("[t]he law in Connecticut on impeaching a witness' credibility provides that a witness may be cross-examined about specific acts of misconduct that relate to his or her veracity"). Our review of the record reveals that the prosecutor's questions were designed to test the defendant's credibility and to rebut, impeach, modify, or explain the defendant's direct testimony. The defendant does not claim that the prosecutor lacked a good faith basis to ask the challenged questions or that the questions themselves or the information sought was inflammatory, inadmissible, unduly prejudicial, or in violation of a court order. We therefore conclude that the prosecutor's questions were not improper.

The prosecutor's commentary indicating that the inconsistent statements in the defendant's video-recorded interrogations would be played later presents a closer question. Gratuitous commentary[14] during cross-examination can be improper, particularly if it is sarcastic, provocative, or aggressive. See, e.g., *State* v. *Wilson*, 308 Conn. 412, 443–44, 64 A.3d 91 (2013) ("the prosecutor's sarcastic 'congratulations,' offered three times over defense counsel's objection, constituted 'an excessive and inappropriate use of sarcasm' "); *State* v. *James R.*, 138 Conn. App. 181, 192, 50 A.3d 936 (state acknowledged that prosecutor's editorial comment " '[o]f course you do' " during defendant's cross-examination was

---

[14] Gratuitous commentary includes, but is not limited to, statements, remarks, and asides that are argumentative or editorial in nature.

improper commentary), cert. denied, 307 Conn. 940, 56 A.3d 949 (2012). However, although objectionable, not all gratuitous prosecutorial commentary during cross-examination rises to the level of impropriety. See, e.g., *State* v. *Andrews*, 313 Conn. 266, 292, 96 A.3d 1199 (2014) (concluding that prosecutor's remark, " '[c]ome on,' " was not improper because it was intended "to encourage the defendant to testify truthfully as to his prior experience in giving, or understanding the purpose of, written statements to the police"); *State* v. *Grant*, 154 Conn. App. 293, 322, 112 A.3d 175 (2014) (concluding that prosecutor's remark " 'really?' " was not improper because it was "an attempt to confirm the truth or to clarify the defendant's responses to his questions"), cert. denied, 315 Conn. 928, 109 A.3d 923 (2015). To determine whether an impropriety exists, we must "consider each alleged impropriety in the context in which it occurred," while remaining aware that our review is "constrained by our inability to assess the tone and body language of the prosecutor . . . and the limitations necessarily imposed by our reliance on the cold, printed record." *State* v. *Andrews*, supra, 284.

Viewing the prosecutor's comments ("[w]e'll play it out later," "I'll play that for you, too," and "[w]e'll play that for you") in the context of the entire trial, we conclude that the defendant has failed to establish that these remarks rose to the level of impropriety. It is true that the defendant's video-recorded interrogations ultimately were not offered into evidence, but the jury was well aware of their existence and the fact that many of the defendant's statements therein were inconsistent with his trial testimony. Indeed, on direct examination, the defendant candidly testified that he had lied to the police multiple times when he was interviewed regarding his involvement in the charged crimes. On cross-examination, the prosecutor questioned the defendant extensively about these inconsistencies, and the defen-

dant freely admitted to many inconsistent statements, although he could not recall making at least two of them. See footnote 13 of this opinion. The defendant does not claim that these two inconsistent statements were inadmissible for impeachment purposes or that the prosecutor lacked a good faith intent to play them at the time he made the challenged remarks. Additionally, the defendant does not claim, and the record does not reflect, that the prosecutor's comments were delivered in a sarcastic, provocative, or aggressive manner. We caution all lawyers, including prosecutors, that the purpose of cross-examination is to pose questions, not to interject argumentative commentary, but we cannot conclude on the present record that the prosecutor's remarks constituted improprieties.

The judgment is affirmed.

In this opinion the other justices concurred.