******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JAHMARI COOPER
## (SC 20865)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Dannehy and Bright, Js.

*Syllabus*

Convicted of murder in connection with the shooting death of the victim inside the stairwell of a housing complex, the defendant appealed to this court. The police had identified the defendant from video surveillance footage, which depicted the defendant leading the victim into a building through a basement door and then exiting the building alone through the front entrance minutes later. The police subsequently obtained a warrant to search the home of the defendant, who was seventeen years old at the time and living with G, his great-grandmother and legal guardian. During the search, officers seized a pistol and bullets from the defendant's bedroom. While the police were at the defendant's residence, they read the defendant his rights under *Miranda* v. *Arizona* (384 U.S. 436), and both the defendant and G signed a card acknowledging that the defendant had been advised of his rights and that he had agreed to speak with the police. Nineteen minutes into the police interview, which occurred in G's presence, the defendant indicated that he did not wish to answer any more questions, but the interview nevertheless continued. The trial court denied the defendant's request to suppress any statements made during the first nineteen minutes of the interview, concluding that, under the totality of the circumstances, the state demonstrated that the defendant had knowingly, voluntarily, and intelligently waived his *Miranda* rights. On appeal, the defendant claimed, inter alia, that the state had failed to demonstrate a knowing and voluntary waiver of his *Miranda* rights. *Held*:

The trial court correctly concluded that, under the totality of the circumstances, the state demonstrated, by a preponderance of the evidence, that the defendant's waiver of his *Miranda* rights was knowing, intelligent, and voluntary.

The record supported the trial court's factual determinations that, at the time of the interview, the defendant was nearly eighteen years old, was in the tenth or eleventh grade, and displayed no indication of a mental or intellectual deficiency; that he was seated in his bedroom, in G's presence, and was not handcuffed or under the influence of drugs or alcohol; and that the tone of the interview between the defendant and the police was conversational; and all of these facts supported a finding of a voluntary and knowing waiver.

There was no merit to the defendant's arguments that his level of education and the allegedly coercive manner in which the police sought the defendant's

waiver of his rights weighed against a finding of a knowing and voluntary waiver.

In considering the totality of the circumstances, it was appropriate to take into account the defendant's prior encounters with the criminal justice system, including thirteen prior arrests and at least eleven separate instances in which he received *Miranda* warnings, and the defendant's invocation of his rights nineteen minutes into the interview also demonstrated that his initial waiver of those rights was knowing and voluntary.

The trial court gave adequate weight to the defendant's age in considering whether his waiver was knowing and voluntary, as it recognized that the defendant was seventeen years old when he was interviewed, but the court concluded that his youth was outweighed by numerous other factors.

Even if this court had assumed that the first nineteen minutes of the police interview should have been suppressed, any error was harmless beyond a reasonable doubt in light of the strength of the state's case and the nature of the statements that the defendant made during that portion of the interview.

This court declined the defendant's request to adopt, under the state constitution, a prophylactic rule pursuant to which a statement made by a juvenile during a custodial interrogation must be suppressed if the juvenile had not been afforded a meaningful opportunity to consult with an interested adult before the juvenile waived his rights.

After considering the relevant factors set forth in *State* v. *Geisler* (222 Conn. 672) for construing the parameters of the Connecticut constitution, this court concluded, like the United States Supreme Court and the majority of other states, that the totality of the circumstances approach, in conjunction with the various statutory requirements concerning the interrogation of juveniles, was sufficient to ensure that any waiver of *Miranda* rights by a juvenile is knowing and voluntary.

The defendant could not prevail on his claim that prosecutorial impropriety during closing and rebuttal arguments deprived him of his constitutional right to a fair trial.

The prosecutor did not improperly mischaracterize the testimony of R, the state's firearm and toolmark examiner, when the prosecutor observed that R had testified "to a certain degree of scientific certainty," "to a scientific certainty," or "to a degree of scientific certainty," as the prosecutor's comments were consistent with the trial court's pretrial order requiring that R's opinions about whether the casings and bullets recovered from the scene of the crime matched those of the firearm found in the defendant's bedroom be phrased in terms of a reasonable degree of certainty or a practical certainty.

Moreover, the prosecutor did not improperly argue facts not in evidence when discussing R's testimony, and the prosecutor's references to R's qualifi-

cations did not, as the defendant claimed, amount to improper vouching for R's credibility but, instead, constituted fair comment on the evidence presented.

The prosecutor did not improperly express her personal opinion, or suggest that she had secret knowledge, about R's testimony when she expressed her disagreement with defense counsel's description of that testimony, as the prosecutor merely summarized R's testimony and invited the jury to conclude that defense counsel's assessment of that testimony was wrong.

With respect to the prosecutor's comments that the victim was "on his hands and knees" and "begging for his life" when he was shot, that the victim had been "forced at gunpoint to strip" naked in order to humiliate him, and that the defendant had "lured" the victim into a stairwell and "set a trap" for him, the prosecutor did not argue facts not in evidence or improperly appeal to the emotions and passions of the jurors, as those comments were based on the evidence presented at trial and the reasonable inferences that could be drawn therefrom, and they were relevant to the issue of whether the defendant had intended to cause the victim's death.

Furthermore, the prosecutor did not improperly appeal to the emotions and passions of the jurors by making frequent references to the victim's nudity at the time of the murder or by emphasizing how the victim, after being shot, dragged himself seventy-five feet across a floor while he was bleeding to death, as the victim's nudity was probative of the defendant's intent to cause the victim's death, and the victim's movements after being shot were relevant to demonstrate that the defendant was the shooter.

Even if the trial court had improperly instructed the jury on the defendant's consciousness of guilt, which stemmed from evidence that the defendant covered his face with a mask when he exited the building in which he shot the victim and that he fled to Florida after he was interviewed by the police, any instructional error was harmless.

This court was not persuaded that the jury likely was misled by the trial court's consciousness of guilt instruction because the state's case against the defendant was strong even without the consciousness of guilt evidence, that case having been based primarily on the testimony of various witnesses, surveillance footage depicting the defendant's conduct before and after the shooting, and evidence recovered from the crime scene and during the execution of the search warrant at the defendant's residence.

Argued May 14—officially released September 30, 2025

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of Fairfield, where the court, *Day-*

*ton, J.*, denied the defendant's motion to preclude certain evidence and granted in part his motion to suppress certain statements; thereafter, the case was tried to the jury before *Dayton, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Erica A. Barber*, assistant public defender, with whom, on the brief, were *Nicole Gagnon* and *Joshua Maddox*, certified legal interns, for the appellant (defendant).

*Heather M. Mansfield* and *Isabella J. Carr-Perri*, certified legal interns, with whom were *Ronald G. Weller*, senior assistant state's attorney, and, on the brief, *Joseph T. Corradino*, state's attorney, and *Tiffany M. Lockshier*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

BRIGHT, J. After a jury trial, the defendant, Jahmari Cooper, was convicted of murder in violation of General Statutes § 53a-54a (a) for fatally shooting the victim, Jeri Kollock, Jr., when the defendant was seventeen years old. In this direct appeal pursuant to General Statutes § 51-199 (b) (3), the defendant claims that (1) the circumstances of his custodial police interrogation do not establish a knowing and voluntary waiver of his *Miranda*[1] rights under the federal constitution, (2) even if this court concludes that the federal constitutional requirements were satisfied, he is entitled to greater protection under our state constitution, (3) prosecutorial impropriety during closing and rebuttal arguments deprived him of his constitutional right to a fair trial, and (4) the trial court erred in giving the jury a consciousness of guilt instruction. We affirm the judgment of the trial court.

---

[1] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

The following facts, which the jury reasonably could have found, and procedural history are relevant to the defendant's appeal. In October, 2017, the victim was shot six times in stairwell B inside building one of the Charles F. Greene Homes housing complex (Greene Homes) in Bridgeport. A resident of the building called 911 at 4:29 p.m. and reported hearing several gunshots. Bridgeport police officers arrived at building one a few minutes later and canvassed the perimeter of the building. An officer tried to enter the basement door at the bottom of an exterior stairwell behind building one, which leads to stairwell B, but the door was locked. Because the basement door automatically locks when it is closed, the door usually would be propped open with a rock. Two police officers entered the building through the front entrance at 4:35 p.m. and exited about five minutes later. The responding officers found no evidence of a shooting, so they left around 4:45 p.m.

About thirty minutes later, however, several people called 911 after they saw the victim on the ground outside the basement door; the victim was naked, covered in blood, and looked like he was "about to die." One of the callers reported that she saw the victim push open the basement door. A resident retrieved a towel from his apartment and draped it over the victim's midsection before officers arrived. The police arrived at 5:16 p.m. and summoned paramedics, who arrived shortly thereafter. The paramedics were unable to revive the victim and declared him dead at 5:25 p.m. An autopsy later revealed that the victim was shot six times, that the trajectory of each bullet was right to left and downward, and that the victim died because of gunshot wounds to the head, torso, and an extremity.

Stairwell B extends from the basement to the seventh story. It consists of switchback flights of stairs that rise seven steps in one direction to a landing and then rise four steps in the opposite direction to a landing at the

next story. There was a trail of blood beginning on the second story landing, continuing down the stairs and across the basement floor, and ending outside the basement door where the victim died. The police found eight spent .45 caliber TulAmmo brand shell casings scattered on the third story landing and the steps ascending to the landing between the third and fourth stories. On the landing between the third and second stories, the police found the victim's clothes and bullet holes approximately eighteen inches above the floor in the corner walls of the landing. This evidence indicated that the shooter was standing on the third story landing while firing down at the victim, who was positioned on the landing between the second and third stories. The bloodstain patterns on the stairs and in the basement indicated that the victim slowly descended the stairs to the basement, dragged himself approximately seventy-five feet across the basement floor, pushed open the exterior door, and pulled himself into the exterior stairwell, where he died.

During the investigation, the police obtained video footage from cameras positioned near the crime scene and identified the victim and the defendant in the footage. At 4:10 p.m., the defendant approached the victim in a parking lot behind Columbus School. The defendant shook the victim's hand and began feeling the victim's pants pockets as though he was checking for a weapon. When the victim stood up and began to walk with the defendant, the defendant stopped and felt the victim's pants pockets again before continuing to walk and talk with the victim. The victim and the defendant remained in the parking lot area for approximately twelve minutes, during which time they interacted with each other as well as with other individuals in the area. At 4:23 p.m., the defendant abruptly turned and walked away from the group, and the victim followed the defendant out of the parking lot. With the victim following a few paces

behind the defendant, they walked to Greene Homes, heading up the rear driveway of the complex. At 4:25:16 p.m., the defendant walked up the stairs leading to the back of building one and out of any camera's view, and the victim followed at 4:25:35 p.m. At 4:28:24 p.m., a camera overlooking the front of building one captured the defendant as he exited the building through the front entrance and covered his face with a mask. The only way to exit the front door of building one after having entered from the rear of the building is to climb stairwell B at least to the fourth floor, cross the floor to the front stairway, and then descend that stairway to the front door.

Approximately two weeks after the shooting, officers obtained a search warrant for the defendant's residence. The defendant, who was seventeen years and nine months old, was living with his great-grandmother, who was his legal guardian. The defendant and his great-grandmother were home when officers executed the search warrant, and Detective Robert Winkler and Lieutenant Christopher LaMaine[2] read the defendant and his great-grandmother *Miranda* warnings before questioning the defendant at the residence. Both the defendant and his great-grandmother signed a card acknowledging that the defendant had been advised of his rights and had agreed to speak to the police. During the interview, which was audio-recorded by the police, the defendant admitted that he had a gun in the house and that he was with the victim near Greene Homes on the day of the murder, but he denied being involved in the shooting. After approximately nineteen minutes, the defendant said that he would not answer any more questions.

During the search, officers seized an Astra .45 caliber pistol with .45 caliber TulAmmo bullets from a dresser

---

[2] We refer to Winkler and LaMaine collectively as the detectives and individually by name, when appropriate.

drawer in the defendant's bedroom; the pistol was wrapped in a dark, hooded sweatshirt like the one worn by the defendant in the surveillance footage.[3] Marshal Robinson, a firearm and toolmark examiner for the Bridgeport Police Department, later concluded, to a reasonable degree of scientific certainty, that the bullets and bullet casings found at the crime scene and removed from the victim's body had been fired and ejected from the pistol found in the defendant's bedroom. In November, 2017, an arrest warrant was issued for the defendant, charging him with, inter alia, murder. After officers were unable to locate the defendant, they notified the United States Marshals Service that they were looking for the defendant. A regional fugitive task force located the defendant in Florida in October, 2018, and he was returned to Connecticut.

Before trial, the state filed a substitute information charging the defendant with a single count of murder, and the case proceeded to trial on that charge. After the state concluded its case-in-chief, defense counsel moved for a judgment of acquittal, arguing that the state had failed to present sufficient evidence that the defendant was the shooter. The court denied the motion, stating: "[T]he defendant was the last person with the victim alive, [he] walked into a building with [the victim], only the defendant walked out of the building, [and] the defendant was found with the murder weapon just two weeks later. I'll note [that] the defendant was also frisking the victim upon encountering him, strongly suggesting [that] there was some sort of animosity between them to begin with. I think there's plenty of evidence from which a rational trier of fact could find the offense proven beyond a reasonable doubt . . . ."

---

[3] The search warrant included authorization to locate a dark sweatshirt, dark sweatpants, and white footwear, which matched what the defendant was wearing in the surveillance footage.

The defendant did not offer any evidence, and, after closing arguments, the court instructed the jury on the charge of murder and, in accordance with the state's request to charge, on the lesser included offenses of manslaughter in the first degree with a firearm and manslaughter in the second degree with a firearm. The jury found the defendant guilty of murder, and the trial court imposed a total effective sentence of forty-five years of incarceration, followed by ten years of special parole. This appeal followed.

I

The defendant claims that the entirety of his statement to LaMaine and Winkler should have been suppressed because the circumstances of his custodial police interrogation did not establish a knowing and voluntary waiver of his *Miranda* rights and that the admission of his improperly obtained statement was not harmless. We are not persuaded.

The following additional facts and procedural history are relevant to the defendant's claim. While officers executed the search warrant at the defendant's residence, the defendant was handcuffed and placed in a police cruiser to be brought to the station for further questioning. Once officers learned that the defendant's legal guardian, his great-grandmother, was unable to leave the home, however, LaMaine and Winkler decided to interview the defendant at his home in the presence of his great-grandmother.[4] They removed his handcuffs, returned him to a bedroom of the home, and began the interview. The defendant's great-grandmother was present for the entire interview.

Before questioning, the detectives read the defendant his *Miranda* rights, and both the defendant and his

_____

[4] Winkler testified that it is the policy of the Bridgeport Police Department that a legal guardian must be present during the questioning of a juvenile.

great-grandmother signed the same *Miranda* rights card.[5] During the interview, the defendant was not handcuffed and did not appear to be under the influence of drugs or alcohol. The detectives questioned the defendant regarding the surveillance footage from the day of the murder and the gun found in his room. The defendant admitted that he was with the victim at Greene Homes, that he had patted him down for weapons, and that he had previously purchased a gun, but he denied participating in the shooting. In the midst of the questioning, the defendant asked to speak with his uncle at least twice.[6] The detectives, however, denied his request, stating that his great-grandmother was his legal guardian and that she had to be present. Nineteen minutes into the interview, the defendant invoked his *Miranda* rights, stating, "I'm not answering no more questions." The detectives, however, continued the interview.

Prior to trial, the defendant filed a motion to suppress the statements he made during the interview on the grounds that (1) he was subject to a custodial interrogation, (2) he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights, and (3) he was not granted a meaningful opportunity to consult with an interested adult prior to being subjected to a custodial interrogation.

The trial court held an evidentiary hearing on the motion to suppress the defendant's statements and, ulti-

---

[5] The detectives used a "blue *Miranda* rights card," which differs from a typical waiver form. Both contain the *Miranda* rights, but the *Miranda* waiver form separately provides for a signature acknowledging a waiver of each right. Winkler testified at the suppression hearing that he used the rights card, as opposed to the waiver form, because the card is used when detectives are out in the field, as opposed to in their offices.

[6] The defendant testified at the suppression hearing that he requested the presence of his uncle because he claimed that his uncle "really knows about my rights, and he knows the law basically. . . . [H]e would have told me . . . if I should talk or if I shouldn't."

mately, granted the motion in part. After conducting a totality of the circumstances analysis, the court found that the defendant was in custody for *Miranda* purposes but that he understood his rights and had voluntarily agreed to speak with the detectives. The court relied on the facts that the defendant "was three months short of his eighteenth birthday," was in the tenth or eleventh grade, did not suffer from an intellectual or mental deficiency, had previously been arrested several times and had previously received *Miranda* warnings on at least eleven occasions, and was not under the influence of marijuana during the interview, despite his testimony at the suppression hearing.[7] The court also found that there was no evidence suggesting that the defendant was threatened or that any physical force was used to coerce him, that he immediately indicated that he understood his rights, and that, nineteen minutes into the interview, he invoked his right to remain silent, further indicating that he understood the *Miranda* warnings.

The trial court additionally found that the defendant's waiver was knowing, voluntary, and intelligent, despite not having consulted privately with his guardian before waiving his *Miranda* rights. The court relied on the facts that the defendant never requested to speak privately with his great-grandmother, the detectives waited until his great-grandmother was present before reading the defendant his *Miranda* rights, and there was nothing in the record to suggest that his great-grandmother would have recommended that he not speak with the detectives, particularly because she repeatedly sug-

---

[7] Although the defendant testified that he had smoked marijuana before speaking to the detectives, the trial court found that his testimony was not credible for three reasons. First, the defendant, after being confronted with an inconsistency regarding when exactly he had last smoked, stated that he did so before going to sleep several hours before the detectives' arrival. Second, marijuana was not found on the premises. Third, an experienced detective "credibly testified that the defendant did not appear to be under the influence of marijuana or any other substance."

gested during the interview that the defendant be truthful with the detectives to clear his name. Accordingly, the court stated that the "totality of the circumstances [led it] to conclude that the state proved by a preponderance of the evidence that the defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights." The court did, however, suppress all of the statements the defendant made after he stated that he did not wish to answer any more questions, as he had invoked his right to remain silent.

Our review of the defendant's claim is informed by the following principles. "To be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights. . . . Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case. . . .

"Whether the defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act [on] his constitutional rights. . . . Factors [that] may be considered by the trial court in determining whether an individual had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings . . . his level of intelligence, including his [intelligence quotient (IQ)] . . . his age . . . his level of education . . . his vocabulary and ability to read and write in the language in which the warnings were given . . . intoxication . . . his emotional state . . . and the existence of any mental disease, disorder or retardation. . . . Although the issue [of whether there has been a knowing and voluntary waiver] is . . . ultimately factual, our usual deference to fact-finding by the trial court is qualified, on questions of this nature,

by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 50–51, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

A

On appeal, the defendant claims that the state failed to prove by a preponderance of the evidence that he knowingly, voluntarily, and intelligently waived his *Miranda* rights. We are not persuaded.[8]

As an initial matter, we note that the record fully supports the trial court's factual findings that the defendant was three months shy of turning eighteen, was in the tenth or eleventh grade, and displayed no indication of any mental or intellectual deficiencies. The evidence from the suppression hearing also supports the court's finding that, when the defendant was advised of his rights and interviewed, he was seated in a bedroom of his home with his legal guardian present, was not handcuffed, and was not under the influence of drugs or alcohol. In addition, there is no dispute that the defendant, after being advised of his *Miranda* rights, invoked his right to remain silent nineteen minutes into the interview, which lasted a little less than one hour. The defendant's tone was not emotional, and the tone of the interview between the defendant and the detectives was conversational. These factors support the court's finding of a voluntary and knowing waiver.

Despite these facts, the defendant argues that his waiver was not knowing and voluntary for four reasons. First, the defendant argues that his level of education

[8] In this appeal, the state does not contest that the defendant was in custody at the time of the interview.

weighs against a finding of a knowing and voluntary waiver because, at the time of the interrogation, he had not yet completed high school, had attended an alternative school, and had qualified for special education services. He also points to a presentence evaluation suggesting that he suffered from posttraumatic stress disorder and that his IQ of 79 was "borderline."[9] Although the defendant had not finished high school at the time of his interview, he was either a sophomore or a junior, and there was no indication that, as a functional matter, he suffered from any intellectual or mental deficiency. Additionally, at the hearing on the motion to suppress, the defendant testified that he was placed in an alternative school because he could not "behave in regular school." He also testified that, although he had two special education classes, he was still taking regular courses. Accordingly, these factors do not weigh against a finding of a knowing and voluntary waiver.

We also decline to consider the opinions included in the defendant's presentence evaluation because that evaluation was not before the trial court at the suppression hearing, meaning that the state could not challenge it and the court could not make any factual findings with respect to it. Evidence that was not presented to the trial court during the suppression hearing will not be considered because "[c]onsideration of such evidence for the first time on appeal, without the benefit of effective state rebuttal or trial court determinations of credibility and fact, would usurp the trial court's role

---

[9] According to the fourth edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, "borderline intellectual functioning" corresponds with an IQ in the 71 to 84 range. See American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (4th Ed. 1994) p. 684. In the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders, the IQ range was removed from the diagnostic description of borderline intellectual functioning. See American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (5th Ed. 2013) p. 727.

as the finder of fact." *State* v. *Canales*, 281 Conn. 572, 586, 916 A.2d 767 (2007). Accordingly, we will not consider this evaluation.

Second, the defendant claims that "the formulaic and coercive nature of the presentation of the waiver weighs against a finding of knowing and voluntary waiver." The defendant contends that the detectives minimized the importance of the defendant's rights by indicating to the defendant that they needed to address "a couple things" and by stating, when the defendant asked what he was signing, "[j]ust what you were read." First, there is no indication that the detectives' conduct overbore the defendant's will and coerced his waiver. We also disagree that telling the defendant and his great-grandmother that they were signing what was read to them somehow downplayed the importance of the waiver. The detectives directly answered the defendant's question and told him what he was signing.

The defendant also argues that Winkler coerced him into waiving his rights by stating, "you have to tell me yes," after Winkler asked the defendant whether he waived his rights and received "no response." The defendant essentially argues that he was told that the only acceptable answer was "yes" and that he had to waive his rights. We disagree with the defendant's interpretation of Winkler's statement. The record reflects that, after Winkler asked the defendant whether he was "willing to waive, [to] give up [his *Miranda*] rights and answer any questions," there was a momentary silence before the defendant responded, "[o]h, yeah," indicating that the defendant initially did not realize that a verbal assent was required and that a nonverbal assent was not sufficient to constitute a waiver of his constitutional rights. Thus, we reject the defendant's argument.

Along these lines, the defendant additionally contends that the detectives used deceptive practices by

making false claims about what the surveillance footage showed, specifically when they "falsely claimed that the surveillance footage depicted the back of [building one] and that it showed 'without any doubt' that the defendant walked down into the basement." See *State* v. *Griffin*, 339 Conn. 631, 674, 262 A.3d 44 (2021) ("we take this opportunity to emphasize that misrepresentations by interrogating officers about the strength of their case against a defendant can, under certain circumstances, add to the coercive nature of an interrogation"), cert. denied,       U.S.      , 142 S. Ct. 873, 211 L. Ed. 2d 575 (2022); cf. General Statutes § 54-86q (a) through (c) (prohibiting use of certain "deception or coercive tactics" during interrogation of juveniles on or after October 1, 2023). Whether the detectives used deceptive practices during the interview, however, has no bearing on our analysis of whether the defendant made a knowing and voluntary waiver because the detectives' allegedly deceptive statements occurred *after* the defendant had waived his *Miranda* rights.[10] Thus, we do not consider the detectives' statements made after the waiver in our analysis.[11]

---

[10] The defendant does not challenge the voluntariness of the statements themselves; he only contests that his *Miranda* waiver was not knowing and voluntary.

[11] We also agree with the state that, because this claim was not raised at trial, the state had no opportunity to respond to it, and the trial court never considered it. Although the defendant argues that the claim was adequately preserved because the state entered the footage into evidence and because it was allegedly uncontested that the footage did not show the defendant entering the basement, the defendant did not claim that the detective used a deceptive practice during the interview, such that the trial court could not specifically address the detective's tactics to conclude whether they were deceptive. See *State* v. *Griffin*, supra, 339 Conn. 665 ("[t]he [trial] court then addressed individually the tactics specifically complained of by the defendant, determining that they were not inherently coercive and/or were not in fact causally related to the defendant's decision to confess"). In addition, because the footage showed the defendant behind the building minutes before he exited through the front door, and because the only way to enter the rear of the building and exit through the front door is through the basement entrance and then by using stairwell B, we reject the premise of the defendant's argument that the detectives did not have a basis to

Third, the defendant argues that he lacked a sufficient understanding about the consequences of his waiver and that his previous waiver in juvenile proceedings was dissimilar and hindered his understanding of the waiver's consequences. Although the defendant's prior encounters with the criminal justice system should be given less weight than if he had been an adult, we disagree with any suggestion that his thirteen prior arrests and at least eleven prior *Miranda* warnings are entitled to no weight.[12] See *Fare* v. *Michael C.*, 442 U.S. 707, 726, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979) (holding that sixteen year old defendant understood nature of his waiver given his "considerable experience with the police"); *State* v. *Whitaker*, 215 Conn. 739, 754, 758, 578 A.2d 1031 (1990) (considering fact that juvenile defendant had prior experience with police in its voluntariness analysis).[13] The defendant's invocation of his right to remain silent also shows that his initial waiver of that right was knowing and voluntary, as "[w]e have held that the [invocation] of the right to remain silent after an initial willingness to speak with [the] police is a strong indication that the defendant understood his rights." (Internal quotation marks omitted.) *State* v. *Reynolds*, supra, 264 Conn. 52–53. Accordingly, we are not persuaded by the defendant's argument.

Finally, the defendant argues that his age weighs against a finding of a knowing and voluntary waiver and

conclude that he must have entered the building through the basement door.

[12] The defendant additionally admitted that, "on at least one of those occasions, he waived his *Miranda* rights in the presence of his uncle and agreed to speak with the police." Although we agree with the state and the trial court that this is a factor to be considered, it carries very little weight in our analysis, given that the defendant was twelve years old when he previously waived his rights.

[13] To be clear, prior exposure as a juvenile to *Miranda* warnings does not automatically indicate that a waiver was knowing and voluntary; there may be circumstances in which the significance of the prior experience cannot be determined or even weighs against a finding of waiver. In the present case, our point is that the conclusion that the trial court reached was not unreasonable.

that, when the trial court determined that the defendant waived his *Miranda* rights, it "did not account for the significant cognitive and developmental differences between juveniles and adults, which can inhibit juveniles' comprehension of *Miranda* warnings and the consequences of waiving their rights." Similarly, the defendant contends that the fact that he had no meaningful opportunity to privately consult with his guardian or an interested adult after being advised of his rights and prior to executing the waiver weighs against a finding that his waiver was knowing and voluntary. We find both arguments unpersuasive given the totality of the evidence before the trial court.

As an initial matter, we agree with the defendant that juveniles are particularly susceptible to various interrogation tactics due to their cognitive and developmental differences. See S. Baker et al., "A Critical Discussion of Youth *Miranda* Waivers, Racial Inequity, and Proposed Policy Reforms," 29 Psychol. Pub. Policy & L. 320, 325 (2023) ("Interestingly, age, regardless of level of *Miranda* understanding and appreciation, has been shown to predict self-reported likelihood of giving a confession . . . . In fact, low levels of *Miranda* comprehension are associated with increased likelihood of both waiving rights and making false confessions . . . indicating that young [persons involved in the legal system] are vulnerable to waiving *Miranda* unknowingly and unintelligently, regardless of other demographic factors. In other words, those who cannot understand or appreciate the consequences of waiving their rights are most vulnerable to doing so, which is contradictory to the intentions of . . . *Miranda* . . . ." (Citations omitted.)).

Given the developmental and cognitive differences between juveniles and adults, courts and legislatures around the country, including in Connecticut, have recognized the need for additional procedural protections

for juveniles involved in the criminal justice system. For example, following the United States Supreme Court's decision in *Miller* v. *Alabama*, 567 U.S. 460, 476–77, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), which held that "an offender's age and the hallmarks of adolescence must be considered as mitigating factors before a juvenile can serve" a mandatory sentence of life imprisonment without the possibility of parole; *State* v. *McCleese*, 333 Conn. 378, 383, 215 A.3d 1154 (2019); our legislature implemented changes to the sentencing scheme for juvenile offenders, emphasizing the importance of considering a juvenile's age. See id., 383–84 and n.2, 400; see also Public Acts 2015, No. 15-84, § 1, codified as amended at General Statutes § 54-125a (f); Public Acts 2015, No. 15-84, § 2, codified at General Statutes § 54-91g. Specifically, with respect to the questioning of juveniles, the legislature has provided that, if a juvenile under the age of sixteen is arrested, the police must notify the juvenile's parents or guardian; see General Statutes § 46b-133 (f); and any confession or admission made by the juvenile outside of the presence of a parent or guardian is inadmissible in a delinquency proceeding. See General Statutes § 46b-137 (a). More recently, the legislature has prohibited the police from using certain deception or coercive tactics during custodial interrogations to elicit confessions from individuals under the age of eighteen. See General Statutes § 54-86q (a) through (c).[14]

Similarly, courts have consistently recognized that "[j]uveniles receive heightened protections when it comes to custodial interrogations for obvious reasons. Common sense tells us that juveniles—teenagers and children alike—are typically less mature, often lack judgment, and are generally more vulnerable to pressure than adults. See *J. D. B.* v. *North Carolina*, 564

---

[14] Section 54-86q became effective October 1, 2023, after the defendant's trial. See Public Acts 2023, No. 23-27, § 1.

U.S. 261, 272–73, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011). For those and other reasons, 'the greatest care must be taken to [en]sure that' a juvenile's admission is 'voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.' *In re Gault*, 387 U.S. 1, 55, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967)." *In re A.A.*, 240 N.J. 341, 354, 222 A.3d 681 (2020). Consequently, Connecticut courts have recognized the value and importance of considering a defendant's age in the totality of the circumstances analysis when determining whether a defendant knowingly and voluntarily waived his *Miranda* rights. See, e.g., *State* v. *Castillo*, 329 Conn. 311, 326–28, 186 A.3d 672 (2018) (concluding that Appellate Court correctly considered, among other factors, defendant's age in analyzing voluntariness of his statements).[15] This factor, however, is not dispositive and can be outweighed by other compelling factors.[16]

---

[15] See also *State* v. *Ledbetter*, 263 Conn. 1, 18, 818 A.2d 1 (2003) ("[t]he totality of the circumstances test, which, we emphasize, must be applied with special care to confessions made by children . . . adequately protects the rights of children because it affords a court the necessary flexibility to take into account a [child's] limited experience . . . education and . . . immature judgment" (citation omitted; internal quotation marks omitted)); *Ricks* v. *Commissioner of Correction*, 98 Conn. App. 497, 514–15, 909 A.2d 567 (2006) ("[a]lthough age is a factor to be taken into account in determining whether a statement is voluntary, it is only one of many factors, and a court must consider all of the circumstances surrounding the making of the statement"), cert. denied, 281 Conn. 907, 916 A.2d 49 (2007).

[16] See *State* v. *Russaw*, 213 Conn. App. 311, 352–53, 278 A.3d 1 ("We disagree with the defendant's argument that the fact that he had just turned eighteen years old the day before the interrogation requires a different conclusion. As the court found, the defendant had an eleventh grade education, could read and write, was not impaired in any way, signed two waiver of rights forms after having been informed, twice, of his *Miranda* rights, and, after previously having agreed to speak with [the] police, asserted his right to counsel."), cert. denied, 345 Conn. 902, 282 A.3d 466 (2022); *State* v. *Miller*, 137 Conn. App. 520, 532, 48 A.3d 748 ("neither [the defendant's] age nor his level of education made him vulnerable to misunderstanding his rights as presented to him or to being coerced into involuntarily waiving his rights."), cert. denied, 307 Conn. 914, 54 A.3d 179 (2012); *State* v. *Griffin*,

In the present case, the trial court recognized that the defendant "was three months short of his eighteenth birthday" when he was interviewed but concluded that his age was outweighed by other factors, such as his previous experience with law enforcement, the lack of evidence indicating an intellectual or mental deficiency, and the facts that the defendant "was not emotional" during the interview and that "the tenor of the [interview] was generally conversational." On the basis of those factors, among others, the court determined that "the defendant understood his rights and voluntarily agreed to speak with the detectives." Thus, the record does not support the defendant's contention that the court failed to give adequate weight to his age.

The defendant's additional argument regarding his inability to privately consult with his guardian or an interested adult after he was advised of his rights and before he executed the waiver fails for the same reason. Although federal courts have held that a juvenile's lack of a meaningful opportunity to privately consult with a guardian or an interested adult is a factor to be considered in the totality of the circumstances, that factor is not dispositive. Cf. *Fare* v. *Michael C.*, supra, 442 U.S. 728 ("[w]e conclude . . . that whether the statements obtained during subsequent interrogation of a juvenile who has asked to see his probation officer, but who has not asked to consult an attorney or expressly asserted his right to remain silent, are admissible on the basis of waiver remains a question to be resolved on the totality of the circumstances surrounding the interrogation"). We agree with the New Jersey Supreme Court that, "[w]hen younger offenders are in custody, the parent serves as a buffer between the juvenile, who is entitled to certain protections, and the police, whose

77 Conn. App. 424, 427, 450, 823 A.2d 419 (2003) (concluding that fourteen year old defendant intelligently and knowingly waived his *Miranda* rights in light of additional factors), aff'd, 273 Conn. 266, 869 A.2d 640 (2005).

investigative function brings the officers necessarily in conflict with the juvenile's legal interests. *Parents are in a position to assist juveniles in understanding their rights, acting intelligently in waiving those rights, and otherwise remaining calm in the face of an inter-rogation.*" (Emphasis in original; internal quotation marks omitted.) *In re A.A.*, supra, 240 N.J. 355–56. Consequently, depending on the circumstances, whether a juvenile had the opportunity to speak with an interested adult may "weigh heavily" in the court's analysis. Id., 359. Ultimately, however, it is one factor that can be outweighed by others.

In the present case, the trial court determined that this factor carried little weight because the defendant did not actually request to speak privately with his great-grandmother at any point before or during the interview. Although the court did not address the defendant's explicit request to consult with his uncle, that request did not come until *after* he had waived his *Miranda* rights, and the defendant never asked to end the interview when his request to speak with his uncle was denied, as he did a few minutes thereafter. On the basis of our review of the record, we conclude that it does not support a finding that, at any time during the first nineteen minutes of the interview, the defendant's will was overborne or that he was compelled to talk when he wanted to remain silent. Thus, we reject the defendant's arguments.

After considering the totality of the circumstances, we agree with the trial court that the state proved by a preponderance of the evidence that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights.

## B

Furthermore, even if we assume that the portions of the interview admitted into evidence should have been

suppressed, we agree with the state that the admission of those portions of the interview was harmless beyond a reasonable doubt. The defendant argues that any error was harmful because the prosecutor directed the jury's attention to the defendant's "damaging admissions" to persuade the jury that the defendant was responsible for the victim's death. We disagree with the defendant that he made any "damaging admissions" during his interview.

First, the defendant did not confess that he committed the crime. See, e.g., *State* v. *Mitchell*, 296 Conn. 449, 461, 996 A.2d 251 (2010) ("[t]he most noteworthy fact is that the defendant's statements were not inculpatory; he did not confess to committing any crime"). Second, although we agree that the defendant's admission that he purchased the gun would otherwise have been inculpatory, the police found the gun in his room, wrapped in a dark sweatshirt that matched the clothing he was wearing in the surveillance video, *before* the defendant's interview and independent of any confession. Third, although the prosecutor relied on some of the defendant's statements during closing argument, her case relied largely on the surveillance footage, which showed the defendant meeting with the victim, patting him down for weapons, leading him to Greene Homes, and then leaving the housing complex alone, mere minutes after the victim was shot. The prosecutor additionally relied on the shell casings found in the stairwell where the victim was shot, which matched the gun and ammunition found in the defendant's home. Accordingly, given the nature of the defendant's statements and the strength of the state's case, we conclude that any improper admission of the defendant's statements made during his nineteen minute interview was harmless beyond a reasonable doubt.

## II

Next, the defendant contends that, even if he waived his *Miranda* rights under the federal constitutional

standard, he is entitled to greater protection under the state constitution. Specifically, the defendant argues that this court "should adopt a bright-line rule that would require suppression when a juvenile defendant in police custody is not given a meaningful opportunity to consult with an interested adult outside the coercive, police dominated environment before executing a waiver." We conclude that the recognition of such a right is not warranted.

The issue we must decide is "whether to adopt an additional layer of prophylaxis to prevent a significant risk of deprivation of those vital constitutional rights protected under *Miranda*." *State* v. *Purcell*, 331 Conn. 318, 342, 203 A.3d 542 (2019). When a defendant proposes a new prophylactic rule, "the nature of the question before us will inform our consideration of the *Geisler*[17] factors." (Footnote added.) Id., 343. In the present case, both parties analyze the defendant's state constitutional claims by applying the *Geisler* factors. We agree that those factors inform our analysis of whether the defendant's proposed prophylactic rule should be adopted as a state constitutional protection.

"It is well settled that the federal constitution sets the floor, not the ceiling, on individual rights." Id., 341. "In construing the Connecticut constitution to determine whether it provides our citizens with greater protections than the federal constitution, we employ a multifactor approach that we first adopted in [*State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992)]. The factors that we consider are (1) the text of the relevant constitutional provisions; (2) related Connecticut precedents; (3) persuasive federal precedents; (4) persuasive precedents of other state courts; (5) historical insights into the intent of [the] constitutional [framers]; and (6) contemporary understandings of applicable

---

[17] *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992).

economic and sociological norms [otherwise described as public policies].” (Internal quotation marks omitted.) *State* v. *Griffin*, supra, 339 Conn. 691. We conclude that our review of the *Geisler* factors does not support our adoption of the defendant’s proposed prophylactic rule.

First, although we have held that the self-incrimination clause in the state constitution is “not materially different from” that of the fifth amendment to the federal constitution,[18] “[t]his court has . . . recognized . . . that the due process concerns that operate at the intersection between the right to counsel and the privilege against self-incrimination may require greater protection than that afforded by the federal constitution under some circumstances.” *State* v. *Purcell*, supra, 331 Conn. 344–45. Given these competing considerations, this factor does not inform our analysis.

Second, we turn to relevant Connecticut precedent, which has long reflected an interest in protecting the rights of juveniles facing prosecution in the criminal justice system. Our courts, however, have “never held [in the context of a criminal prosecution] that a minor in custody has the right to contact a parent, [or] that contact with a parent is required before a minor can effectively waive his *Miranda* rights.” *State* v. *Whitaker*, supra, 215 Conn. 747–48; see id., 751 (“[a]t a minimum,

---

[18] The fifth amendment to the United States constitution provides in relevant part that “[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . .” U.S. Const., amend. V. The fifth amendment privilege against self-incrimination is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Malloy* v. *Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964).

Similarly, article first, § 8, of the Connecticut constitution provides in relevant part that “[n]o person shall be compelled to give evidence against himself . . . .” Conn. Const., art I, § 8; see also *State* v. *Asherman*, 193 Conn. 695, 712, 714–15, 478 A.2d 227 (1984) (holding that there is no constitutional difference between “giving evidence” and “being a witness” against oneself), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).

the presence of a lay parent or guardian, with no training in law, is no guarantee that a child will be fully informed or meaningfully represented" (internal quotation marks omitted)); see also *State* v. *Oliver*, 160 Conn. 85, 94, 273 A.2d 867 (1970) ("[w]e cannot accept the suggestion that every minor is as a matter of law incompetent to waive his constitutional rights to remain silent and to an attorney unless the waiver is consented to by a parent or guardian who has himself been advised of the minor's rights" (internal quotation marks omitted)), cert. denied, 402 U.S. 946, 91 S. Ct. 1637, 29 L. Ed. 2d 115 (1971). Instead, as we discussed in part I A of this opinion, we utilize the totality of the circumstances standard when assessing whether a juvenile has made a valid waiver under the state constitution, giving significant weight to the age of the juvenile. See *State* v. *Castillo*, supra, 329 Conn. 327; see also *State* v. *Perez*, 218 Conn. 714, 725, 591 A.2d 119 (1991) ("[t]he totality of [the] circumstances standard is capacious enough to take the necessity of [advice that there was a possibility that a juvenile's case would be transferred to the regular criminal docket] into account in the court's determination of whether, under all the circumstances of a given case, the defendant's waiver was voluntary"). Indeed, we have long emphasized that "[t]he totality of the circumstances test, which . . . must be applied with special care to confessions made by children . . . adequately protects the rights of children because it affords a court the necessary flexibility to take into account a [child's] limited experience . . . education and . . . immature judgment . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Ledbetter*, 263 Conn. 1, 18, 818 A.2d 1 (2003). Therefore, this factor weighs against the defendant.

Third, regarding federal precedent, the defendant cites to multiple United States Supreme Court cases in which the court acknowledged "the propriety of distin-

guishing juveniles from adults based on empirical evidence showing juveniles' intellectual and emotional immaturity relative to their adult counterparts . . . ." See, e.g., *In re Gault*, supra, 387 U.S. 55 ("[w]e appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique— but not in principle—depending [on] the age of the child and the presence and competence of parents"). Although the United States Supreme Court has recognized a distinction between juveniles and adults in various contexts, the court always has applied a totality of the circumstances standard when determining whether a juvenile's waiver was knowing and voluntary.

In *Fare* v. *Michael C.*, supra, 442 U.S. 707, the United States Supreme Court held that the California Supreme Court had erred in finding that the juvenile defendant's request for his probation officer was a per se invocation of his rights under *Miranda*. See id., 727–28. Instead, the court held that the issue of whether the defendant had validly waived his rights was to be resolved using the totality of the circumstances standard. See id., 724– 25. Indeed, it determined that a totality of the circumstances approach was "adequate to determine whether there has been a waiver even [when] interrogation of juveniles is involved." Id., 725. The court observed that there was "no reason to assume that . . . courts— especially juvenile courts, with their special expertise in this area—will be unable to apply the [totality of the circumstances] analysis so as to take into account those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved." Id.; see also *Gallegos* v. *Colorado*, 370 U.S. 49, 55, 82 S. Ct. 1209, 8 L. Ed. 2d 325 (1962) ("[t]he youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juve-

nile Court, the failure to see to it that he had the advice of a lawyer or a friend—all these combine to make us conclude that the formal confession on which this conviction may have rested . . . was obtained in violation of due process" (citation omitted)). Accordingly, this factor does not support the defendant's claim.

Fourth, of the states that have addressed the issue, most do not apply the exclusionary rule when a juvenile is not given the opportunity to consult with an interested adult before waiving his *Miranda* rights.[19] See K. King, "Waiving Childhood Goodbye: How Juvenile Courts Fail To Protect Children from Unknowing, Unintelligent, and Involuntary Waivers of *Miranda* Rights," 2006 Wis. L. Rev. 431, 452–53 and n.92 (discussing states that apply totality of circumstances test); see also id., 453–75. The New Jersey Supreme Court, for example, although having placed an additional requirement on law enforcement to allow a juvenile to have a meaningful consultation with a parent or guardian prior to the waiver of the juvenile's rights, concluded that the failure to do so does not require suppression but, rather, is a fact that "should weigh heavily in the totality of the circumstances to determine whether the juvenile's

---

[19] See *Smith* v. *State*, 918 A.2d 1144, 1149–50 (Del. 2007) ("This [c]ourt has expressly rejected the so-called interested adult rule—the contention that a juvenile cannot waive his rights without first being given the opportunity to consult with a parent or other interested adult. But, the lack of guidance from an interested adult certainly is a factor in the totality of [the] circumstances." (Footnote omitted; internal quotation marks omitted.)); *State* v. *Farrell*, 145 N.H. 733, 738, 766 A.2d 1057 (2001) ("[i]n an effort to preserve the requisite measure of special protection afforded juveniles . . . the absence of an opportunity to consult with an adult shall be given greater weight when assessing the totality of the circumstances surrounding a juvenile waiver"); *State* v. *Presha*, 163 N.J. 304, 308, 748 A.2d 1108 (2000) ("courts should consider the absence of a parent or legal guardian from the interrogation area as a highly significant fact when determining whether the [s]tate has demonstrated that a juvenile's waiver of rights was knowing, intelligent, and voluntary"); *In re Jimmy D.*, 15 N.Y.3d 417, 422, 938 N.E.2d 970, 912 N.Y.S.2d 537 (2010) ("it does not follow as a matter of law that a child's confession obtained in the absence of a parent is not voluntary").

waiver and statements were voluntary." *In re A.A.*, supra, 240 N.J. 359. Accordingly, most courts have determined that a totality of the circumstances approach best accommodates "the special needs of juveniles . . . in a manner that affords protection not only to juveniles, but also to the interests of society and of justice." *State* v. *Fernandez*, 712 So. 2d 485, 489 (La. 1998); see id. ("Excluding an otherwise valid confession of guilt just because the accused was a few months away from achieving [nonjuvenile] status is simply too high a price to pay for the arguable benefit of more easily administering a per se rule that neither the framers of the [c]onstitution nor the redactors of the [Louisiana] Code of Criminal Procedure considered necessary. A confession by a juvenile given without a knowing and voluntary waiver can be, and should be, suppressed under the totality of [the] circumstances standard applicable to adults, supplemented by consideration of other very significant factors relevant to the juvenile status of the accused."); see also *Commonwealth* v. *Williams*, 504 Pa. 511, 521, 475 A.2d 1283 (1984) (The court overruled its precedent applying "a rebuttable presumption that a juvenile is incompetent to waive his constitutional rights without first having an opportunity to consult with an interested and informed adult," instead concluding that "[t]he requirements of due process are satisfied, and the protection against the use of involuntary confessions which law and reason demand is met by application of the totality of [the] circumstances analysis to all questions involving the waiver of rights and the voluntariness of confessions made by juveniles. . . . Among those factors are the juvenile's youth, experience, comprehension, and the presence or absence of an interested adult.").

Some states apply at least some version of the prophylactic rule the defendant urges.[20] Vermont is the only

[20] See, e.g., K. King, supra, 2006 Wis. L. Rev. 451–52 and nn.90 and 91 (observing that seven states "have created presumptions that a juvenile

state that has held that any suspect under the age of eighteen must be given the opportunity to consult with an interested adult in order for a waiver of his privilege against self-incrimination and his right to counsel to be valid and that any failure to do so results in suppression. See *State* v. *Piper*, 143 Vt. 468, 471–73, 468 A.2d 554 (1983). In doing so, the court articulated that "[t]he purpose of the rule is to guard against improvident waivers resulting from the minor's lack of sophistication or experience. In many cases, a mature decision cannot be made by a minor who is isolated, ignorant of his rights or intimidated by his surroundings. The rule is an attempt to guarantee that his decision is as well considered as that of an adult under similar circumstances." Id., 473; see also *In re E. T. C.*, 141 Vt. 375, 379, 449 A.2d 937 (1982) ("[i]t would indeed be inconsistent and unjust to hold that one whom the [s]tate deems incapable of being able to marry, purchase alcoholic beverages, or even donate their own blood, should be compelled to stand on the same footing as an adult when asked to waive important . . . rights at a time most critical to him and in an atmosphere most foreign and unfamiliar" (internal quotation marks omitted)). Massachusetts requires the suppression of statements made by a juvenile under the age of fourteen if the juvenile is not afforded an opportunity to speak with an interested adult who can explain the juvenile's constitutional rights. See, e.g., *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 134, 449 N.E.2d 654 (1983). If the juvenile is at least fourteen years old, however, the juvenile may make a valid waiver without an actual consultation. See, e.g., *Commonwealth* v. *Alfonso A.*, 438 Mass. 372, 380, 780 N.E.2d 1244 (2003). In such circumstances, the state "must make the alternative

under a set age cannot waive *Miranda* rights or cannot waive these rights without an opportunity to consult with a parent" and that seven additional states "require that a parent is present during questioning only when the child is younger than a designated age, typically thirteen or fourteen").

showing of circumstances [demonstrating] a high degree of intelligence, experience, knowledge, or sophistication on the part of the juvenile." (Internal quotation marks omitted.) Id., 384. Thus, if a juvenile is at least fourteen years old, the court undertakes a modified totality of the circumstances analysis, requiring the state to demonstrate that the waiver was knowing and intelligent when the juvenile has not consulted with an interested adult. See id., 380–81. Considering the reasoning underlying the approach in other states, we find more persuasive the totality of the circumstances approach, which requires that the state prove that the waiver was knowing and voluntary, taking into account the defendant's age, experience, comprehension, education, and maturity, while also ensuring that potentially significant evidence is available to the fact finder when the state has met its burden.

Furthermore, although public policy considerations do not tilt in only one direction, we cannot say that they convincingly favor adoption of the defendant's prophylactic rule. As we discussed in part I A of this opinion, we agree with the defendant that juveniles are particularly susceptible to various interrogation tactics, such that the presence or absence of additional procedural protections during an interview is an important consideration for the court when ruling on a motion to suppress. Additionally, our legislature has enacted laws that require that parents be present when a juvenile under the age of sixteen is arrested and interviewed by the police and that prohibit the police from using deception or coercive tactics during the interview of a juvenile. See part I A of this opinion. We agree with the defendant that this is evidence of the legislature's interest in protecting juveniles in criminal proceedings but observe that the legislature otherwise has been silent regarding additional protections for juveniles and specifically for those charged in adult proceedings, as

opposed to juvenile proceedings. See *State* v. *Canady*, 297 Conn. 322, 332, 998 A.2d 1135 (2010) ("the defendant's trial in *criminal court* cannot be considered a proceeding concerning a delinquent child, and, consequently, it falls outside the scope of § 46b-137 (a)" (emphasis in original)). This legislative inaction is not itself a reason to reject the adoption of a constitutional safeguard, of course, but we take the legislature's demonstrated willingness recently to enact protections for juveniles in the specific context of police interrogations as a good reason for us to exercise caution under the present circumstances.[21]

Considering all of the *Geisler* factors, we decline to adopt the defendant's proposed prophylactic rule. Like the United States Supreme Court and the majority of our sister states, we conclude that the totality of the circumstances approach, in conjunction with statutory requirements imposed by our legislature, is sufficient

---

[21] We are particularly hesitant to adopt the defendant's proposed prophylactic rule given that there is considerable debate over the utility of such a rule. Studies have shown that parents' "ability to fully assist their children may be limited by their lack of awareness regarding the scope and specifics of consequences that can arise from convictions and adjudications." J. Hellgren et al., "Parent Advice to Children During Interrogations: Do Crime Severity and Perceptions of Consequences Matter?," 30 Psychol. Pub. Policy & L. 273, 282 (2024). In fact, although a majority of parents believe that they would advise their children to assert their *Miranda* rights, "[w]hen parents are with their children in interrogation[s], they seldom advise their children to assert their *Miranda* rights and, instead, are far more likely to either stay silent or [to] urge their child to confess," with a recent study finding that "only around 10 [percent] of parents advised their child to remain silent or [to] get an attorney." Id., 283. This empirical data call into question the defendant's proffered justification for his prophylactic rule. Thus, it appears that whether a juvenile defendant's inability to consult privately with an interested adult impacts the knowing and voluntary nature of his waiver may depend on a host of factors, including, without limitation, the defendant's age, the location of the interview, the conduct of the officers asking about the waiver, the defendant and the interested adult's relationship, and the defendant and the interested adult's familiarity with the criminal justice process and *Miranda*.

to ensure that any waiver by a juvenile of his *Miranda* rights is knowing and voluntary.[22]

## III

The defendant also claims that prosecutorial impropriety during closing and rebuttal arguments deprived him of his constitutional right to a fair trial. Specifically, he claims that the prosecutor improperly (1) mischaracterized Robinson's expert testimony, (2) argued facts not in evidence, and (3) appealed to the emotions of the jurors. We disagree.

When analyzing prosecutorial impropriety claims, we first determine whether the prosecutor's remarks were improper. See, e.g., *State* v. *Diaz*, 348 Conn. 750, 770, 311 A.3d 714 (2024). If prosecutorial impropriety occurred, we then determine whether it deprived the

---

[22] Alternatively, the defendant claims that this court should adopt his rule pursuant to our "inherent supervisory authority over the administration of justice" because "a failure to do so would critically impair the defendant's *Miranda* rights and cast significant doubt on his conviction." (Internal quotation marks omitted.) See, e.g., *State* v. *Elson*, 311 Conn. 726, 765, 91 A.3d 862 (2014) ("there is no principle that would bar us from exercising our supervisory authority to craft a remedy that might extend beyond the constitutional minimum because articulating a rule of policy and reversing a conviction under our supervisory powers is perfectly in line with the general principle that this court ordinarily invoke[s] [its] supervisory powers to enunciate a rule that is not constitutionally required but that [it] think[s] is preferable as a matter of policy" (internal quotation marks omitted)). Consistent with our *Geisler* analysis, however, the defendant has not persuaded us, on this record, that the proposed prophylactic rule is preferable as a matter of policy, particularly because the differences between a juvenile and an adult already constitute a factor trial courts must consider when undertaking a totality of the circumstances analysis. We thus conclude that the circumstances before us do not warrant the extraordinary remedy of the exercise of our supervisory authority. Nevertheless, we note that the issue the defendant raises can be avoided entirely if the police simply offer a juvenile an opportunity to consult privately with an interested adult before asking the juvenile if he wants to waive his *Miranda* rights. Such a practice would be prudent given the heavy weight that could attach to the failure to offer such an opportunity in an appropriate case. For the reasons previously discussed in part I of this opinion, this is not that case.

defendant of his constitutional right to a fair trial. See, e.g., id.; see also *State* v. *Michael T.*, 338 Conn. 705, 719, 259 A.3d 617 (2021) ("[A]n impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Internal quotation marks omitted.)).

"When making closing arguments to the jury, [a prosecutor] must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters [that] the jury ha[s] no right to consider." (Internal quotation marks omitted.) *State* v. *Gary S.*, 345 Conn. 387, 407–408, 285 A.3d 29 (2022).

"Our case law establishes that [a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors [that] are likely to skew that appraisal. . . . Therefore, a prosecutor may argue the state's case forcefully, [but] such argument must be fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) Id., 409.

The prosecutor also "may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position." (Internal quotation marks omitted.) *State* v. *Outing*, 298 Conn. 34, 83, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011). Nevertheless, "not every use of rhetorical language is improper." (Internal quotation marks omitted.) Id.

"[T]he line between comments that risk invoking the passions and prejudices of the jurors and those that are permissible rhetorical flourishes is not always easy to draw. The more closely the comments are connected to relevant facts disclosed by the evidence, however, the more likely they will be deemed permissible." *State* v. *Albino*, 312 Conn. 763, 773, 97 A.3d 478 (2014).

Mindful of these principles, we conclude that the challenged remarks were not improper, and, thus, we do not consider whether any alleged impropriety deprived the defendant of his right to a fair trial. See, e.g., *State* v. *Taft*, 306 Conn. 749, 761 n.13, 51 A.3d 988 (2012).

A

The defendant first claims that the prosecutor improperly mischaracterized Robinson's testimony. More specifically, he argues that the prosecutor improperly (1) contravened the trial court's limiting order regarding the definitiveness of Robinson's opinion, (2) bolstered Robinson's testimony by referring to facts not in evidence and by repeatedly describing Robinson's qualifications when discussing his testimony, and (3) expressed her personal opinion about the import of Robinson's testimony. We are not persuaded.

The following additional facts are relevant to the defendant's claim. During jury selection, the defendant withdrew his request for a *Porter*[23] hearing on the reliability of the anticipated expert testimony from Robinson because the trial court agreed to limit the scope of Robinson's testimony to "a reasonable certainty, a reasonable scientific certainty, a practical certainty, [or] something along those lines, but not a positive match, not an exact match, not definitely the same gun, or anything like that." The court added: "[T]here's no 100 percent." The court clarified these limitations in the following exchange with the prosecutor:

"[The Prosecutor]: . . . My understanding of that ruling is that [Robinson] can't testify that it's [a] 100 percent positive match . . . .

"The Court: I mean, if he's [going to] testify, I looked at this and I looked at this, and to a reasonable scientific certainty, I believe that this gun fired these bullets.

"[The Prosecutor]: Yes. . . . I just wanted to be . . . clear on that . . . that he will testify that it's a match to a reasonable degree of scientific certainty.

"The Court: Right. He just can't be like, unequivocally."

At trial, Robinson initially neglected to qualify his testimony in accordance with the trial court's order, and the court sustained defense counsel's objections

---

[23] *State* v. *Porter*, 241 Conn. 57, 80–90, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). "In *Porter*, we followed the United States Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and held that testimony based on scientific evidence should be subjected to a flexible test to determine the reliability of methods used to reach a particular conclusion. . . . A *Porter* analysis involves a two part inquiry that assesses the reliability and relevance of the witness' methods." (Internal quotation marks omitted.) *State* v. *Edwards*, 325 Conn. 97, 124, 156 A.3d 506 (2017).

to those answers.[24] During a brief recess, and outside the presence of the jury, the court instructed the prosecutor to "remind [Robinson] . . . one more time before he retakes the stand as to the parameters of his testimony so we don't wind up with a problem." When Robinson returned to the stand, he testified that he concluded, to a reasonable degree of scientific certainty, that the bullets and shell casings found at the scene and the bullets removed from the victim's body were fired from the pistol found in the defendant's bedroom. On cross-examination, defense counsel questioned Robinson's methodology and the thoroughness of his testing. On redirect examination, Robinson maintained his opinion.

During closing argument, the prosecutor recounted Robinson's qualifications and his testimony regarding the pistol found in the defendant's bedroom. She noted that Robinson had fifty years of experience as a firearm and toolmark examiner, and stated that Robinson "explained how he can find out if certain bullets and certain casings were fired from a certain gun. He is an expert in this field. He testified that, to a certain degree of scientific certainty, the eight casings found at the

---

[24] When Robinson testified that firearm examiners "identify bullets and/or cartridge cases having been fired from or in a questioned firearm," defense counsel objected, and the court sustained the objection. The following exchange then occurred between the court and Robinson:

"The Court: So, in your job, you're determining to a reasonable certainty whether a particular gun has fired particular ammunition. Is that a fair statement?

"[Robinson]: Your term.

"The Court: That would be my term. Okay. Go ahead."

Shortly thereafter, Robinson testified that he looks at five different areas of identification—"breech face marks, firing pin marks, extractor marks, ejector marks, and chamber marks"—and, if he finds "significant agreement between any of those marks on test cartridge cases that [he has] fired in the suspect weapon, [he] will say that, yes, that cartridge case was fired in that weapon." Defense counsel objected again, and the court sustained the objection and ordered that Robinson's answer be stricken.

scene, the bullets found at the scene, and the two bullets found in [the victim's] body, all came from the same gun, a .45 caliber semiautomatic firearm. But, more importantly, he testified that specifically it was the one found in [the defendant's] dresser that [the defendant] admitted to buying.

"[Robinson] further testified [about] how the unique markings are made on casings and bullets as they're fired from a weapon and that every single one is different. He testified to a degree of scientific certainty that the casings found at the scene were in fact fired from the .45 [caliber] Astra found in [the defendant's] dresser. He testified to a scientific certainty that the bullets found at the scene were fired from the .45 caliber Astra found in [the defendant's] dresser. . . . [M]ost importantly, he testified that the same goes for the two bullets that were pulled out of [the victim's] body, the bullets from the fatal shots that killed [the victim].

\* \* \*

"Robinson never said that it was the same brand and caliber used only. He said, to a degree of scientific certainty, that that gun found in [the defendant's] dresser, the last person to be seen with [the victim] before he died, was the actual gun that was used to shoot [the victim]. He knew that because of the markings, he knew that because of his examination, and he knew that because of his fifty years of experience in doing this. After cross-examination, [his] opinion remained unwavering. He testified that, because of his fifty years of experience in firearms examination and comparison testing, his opinion regarding the bullets, the casings, and the gun comparison in this case remain[s] the same."

In response, defense counsel challenged Robinson's testimony and argued that, "based on [Robinson's] testimony, you can't be certain that the gun that was seized

was [the murder weapon]. There was doubt in his testimony, and there's reasonable doubt in this case." In rebuttal, the prosecutor argued: "I completely disagree [that there was doubt in Robinson's testimony], and, if you are unsure, I would urge you to listen to [his] testimony again. . . . [I]f you listen to his testimony, there will be no question in your mind that those bullets that were found—the shell casings that were found on the scene, the bullets that were found in [the victim], and the bullets that were found at the scene—were fired from the gun that was found in [the defendant's] dresser that he admitted to purchasing."

1

The defendant argues that the prosecutor "flouted the trial court's ordered limitations by claiming with definitiveness that [1] Robinson 'can find out if certain bullets and certain casings were fired from a certain gun,' [2] Robinson 'testified to a scientific certainty' that the bullets found at the scene and those recovered from [the victim's] body 'were fired' from the gun recovered . . . from [the defendant's bedroom], and [3] Robinson 'identified the fact that—and . . . his testimony [leaves] no question in your mind' that—the bullets and shell casings recovered from both the scene and [the victim's] body 'were fired from the gun' recovered from [the defendant's bedroom]." According to the defendant, these statements demonstrate a "deliberate" effort by the prosecutor "to bolster the definitiveness of [Robinson's] expert opinion" and, therefore, were improper.

The prosecutor's arguments regarding Robinson's testimony did not contravene the trial court's limiting order regarding the definitiveness of his conclusions. In *State* v. *Raynor*, 337 Conn. 527, 254 A.3d 874 (2020), although we observed that there is no consensus among courts on what limiting language regarding an expert

witness' opinions is appropriate, we noted that "[o]ptions include requiring an expert to state that his degree of certainty is only 'more likely than not' . . . that the identification is to 'a reasonable degree of certainty' . . . that the identification is to 'a practical certainty' . . . that the identifying characteristics on two items are 'consistent with' each other . . . that the recovered firearm 'cannot be excluded as the source' of the recovered casing . . . or that the expert be requested to describe only similar and distinguishing features without characterizing a conclusion." (Citations omitted.) Id., 555–56. Recognizing those available options, the trial court in the present case limited Robinson to stating that his degree of certainty is only "a reasonable certainty, a reasonable scientific certainty, a practical certainty, [or] something along those lines, but not a positive match, not an exact match, not definitely the same gun, or anything like that."

During closing and rebuttal arguments, the prosecutor noted that Robinson testified "to a certain degree of scientific certainty," "to a scientific certainty," and "to a degree of scientific certainty" when discussing his testimony. Although the prosecutor omitted the adjective "reasonable" during those arguments, the phrase "a certain degree of scientific certainty" conveys something less than absolute certainty and thus falls within the parameters set by the court. Similarly, "a degree of scientific certainty" and "a scientific certainty" are akin to "a practical certainty," which the trial court specifically endorsed before trial. Consequently, we are not persuaded that the prosecutor "referred to Robinson's testimony as providing a level of definitiveness that was" precluded by the trial court's pretrial order. Not only did the prosecutor repeatedly qualify her statements regarding Robinson's testimony with some variation of the phrase "a degree of scientific certainty," she also directed the jurors to review Rob-

inson's testimony if they had any doubts as to its import. Thus, we are not persuaded that the prosecutor mischaracterized Robinson's testimony.[25] Indeed, the fact that defense counsel did not object to the prosecutor's arguments regarding Robinson's testimony undermines the defendant's arguments on appeal that the prosecutor's remarks were a "deliberate" attempt to circumvent the court's limiting order and "to bolster the definitiveness of [Robinson's] expert opinion."

2

The defendant next argues that the prosecutor improperly bolstered Robinson's testimony by arguing facts not in evidence and vouching for his credibility by repeatedly noting his qualifications when discussing his testimony. He contends that, "because the two responses [in which] Robinson was unequivocal with his opinion were stricken from the record, the [prosecutor's] references [to Robinson's testimony] . . . also constitute[d] improper argument of facts outside of evidence." He further contends that the prosecutor's emphasis on Robinson's "qualifications to bolster the certainty of [his] opinion" was "directly in conflict with the trial court's order . . . ." These arguments are unavailing.

First, as we have already explained, the prosecutor's remarks did not convey to the jury that Robinson testified about his conclusions to a degree of absolute certainty, as the defendant suggests. Moreover, the prosecutor "urge[d] [the jury] to listen to [Robinson's] testimony again. . . . [I]f you listen to his testimony, there will be no question in your mind that those bullets

---

[25] Although we conclude that the prosecutor's various descriptions of the certainty of Robinson's testimony were not improper, given Robinson's initial resistance to qualifying his opinion, it would have been more prudent for the prosecutor, during her closing and rebuttal arguments, to use the same language that she had used during her direct examination of Robinson.

that were found—the shell casings that were found on the scene, the bullets that were found in [the victim], and the bullets that were found at the scene—were fired from the gun that was found in [the defendant's] dresser that he admitted to purchasing." A review of that testimony reflects that Robinson testified only to a reasonable degree of scientific certainty that the bullets and shell casings recovered at the crime scene matched the pistol seized from the defendant's bedroom. Consistent with its pretrial order, the trial court sustained defense counsel's objection to, and struck from the record, any testimony from Robinson that stated a more definitive conclusion. Therefore, the prosecutor did not improperly refer to facts not in evidence when discussing Robinson's testimony.

Second, the prosecutor's references to Robinson's qualifications when referring to his testimony were not improper. The prosecutor simply highlighted why the witness was qualified to offer an expert opinion on a critical issue at trial. The prosecutor's references to Robinson's years of experience "did not rise to the level of vouching for the credibility of a witness" but were fair comments on the evidence presented at trial. *State v. Outing*, supra, 298 Conn. 85. Although the prosecutor repeated those qualifications at different times during closing and rebuttal arguments for rhetorical effect, there was nothing improper in doing so. Accordingly, this claim also fails.

3

The defendant further argues that the prosecutor improperly expressed her personal opinion about Robinson's testimony when, in response to defense counsel's argument that "[t]here was doubt in [Robinson's] testimony," the prosecutor stated: "*I completely disagree*, and, if you are unsure, I would urge you to listen to [his] testimony again. That's not how I remembered

it. . . . [I]f you listen to his testimony, there will be no question in your mind that those bullets . . . were fired from the gun that was found in [the defendant's] dresser that he admitted to purchasing." (Emphasis added.) According to the defendant, "the inference urged by the prosecutor—that Robinson 'identified the fact that,' and [that] his testimony leaves 'no question in your mind' that, the recovered bullets and shell casings 'were fired' from the gun found in [the defendant's] home— is an inference that the prosecutor was precluded from arguing, due to the trial court's order prohibiting Robinson from testifying with certainty." He asserts that the prosecutor's expression of her personal belief "carried the suggestion that the prosecutor possessed information unavailable to the jury—namely, that Robinson's opinion was in fact unequivocal, and he was simply prevented by defense counsel and the trial court from testifying as much." We are not persuaded.

To be sure, a prosecutor should frame arguments in terms of the state's theory of the case rather than as an expression of personal belief. See, e.g., *State* v. *Ancona*, 270 Conn. 568, 608–609, 854 A.2d 718 (2004), cert. denied, 543 U.S. 1055, 125 S. Ct. 921, 160 L. Ed. 2d 780 (2005). At the same time, we have recognized that the use of the pronoun "I" is so much a "part of our everyday parlance" that "it cannot always easily be eliminated completely from extemporaneous elocution. . . . Therefore, if it is clear that the prosecutor is arguing from the evidence presented at trial, instead of giving improper unsworn testimony with the suggestion of secret knowledge, his or her occasional use of the first person does not constitute [prosecutorial impropriety]." (Internal quotation marks omitted.) *State* v. *Gibson*, 302 Conn. 653, 660, 31 A.3d 346 (2011).

In the present case, the prosecutor expressed her disagreement with defense counsel's description of Robinson's testimony as leaving "doubt . . . ." In doing

so, the prosecutor recounted Robinson's testimony and directed the jurors to review that testimony again to make their own assessment of Robinson's conclusions. Thus, the prosecutor did not vouch for Robinson's credibility or suggest that she had "secret knowledge" about his testimony. (Internal quotation marks omitted.) *State* v. *Gibson*, supra, 302 Conn. 660. Instead, she summarized Robinson's testimony and invited the jury to conclude that defense counsel's assessment of that evidence was wrong. Consequently, the prosecutor's use of the pronoun "I" during closing argument did not constitute an improper expression of her personal opinion.

## B

The defendant next claims that the prosecutor argued facts not in evidence when she claimed that (1) the victim was "on his hands and knees" and "begging for his life" when he was shot, (2) the victim was "forced at gunpoint to strip . . . [for] [o]nly one reason: to humiliate him," and (3) the defendant "set a trap" for the victim. We are not persuaded.

During closing argument, the prosecutor argued that LaMaine testified that, "on most occasions, the basement door of building one is propped open by a rock. Well, we know it was propped open by a rock that day . . . because [the victim] and [the defendant] entered that building together. You can actually see the rock in one of the photos of [the victim] . . . . We know that at some point the door was closed behind them. Did [the victim] close it? We don't know. Did [the defendant] close it so the police couldn't get in? Not sure. Did [the defendant] try to set a trap for [the victim]? We don't know. We know that it was closed after they entered because (1) the police couldn't get in minutes later, and (2) [the victim] couldn't get out. You can see the bloody

handprints on the back of the door [where] he was trying to push it open."

Shortly thereafter, the prosecutor argued: "LaMaine testified that [the victim] was shot from above at a downward angle. The shooter was either on the stairs above [the victim] or [the victim] was on his knees on the ground. Maybe [the victim] was begging for his life at that point. The autopsy confirms this [because] the trajectory of the bullets through [the victim's] body was downward.

"[The victim] was shot when he was naked. How do I know that? I'm going to show you . . . . This is the shirt that [the victim] had on when he was killed. . . . This shirt doesn't have any blood on it. It doesn't have any bullet holes in it. . . . [T]here is no blood on these pants [that the victim was wearing], and there are no bullet holes in these pants. [The victim] was shot after he took his clothes off. . . . This is the undershirt that he had on that day. . . . I submit to you that there is no blood on this, there are no bullet holes in this, which indicates that he was forced at gunpoint to strip before he was shot and killed. Why would that be done? Only one reason: to humiliate [the victim], and that's what was done that day. A reasonable inference can be drawn based on where the bullets are, the bullet holes in that wall right there, and based on his clothing, that [the victim] was on his hands and knees or on the ground and told to take his clothes off with a gun pointed at his head." At that point, defense counsel objected, stating, "[t]hat was not the testimony." The court overruled the objection, noting that the prosecutor had said "reasonable inference."

During rebuttal, the prosecutor argued that the defendant "planned to kill [the victim] . . . . He brought a mask, he brought a gun, and he immediately checked [the victim] for weapons to make sure he couldn't fight

back. He lured [the victim] into the basement and up the steps. . . . [A]n inference can be drawn that [the defendant] ordered [the victim] to strip naked with a gun pointed toward his head, and [the defendant] then shot him anyway. . . . He was shot in the head. The trap had been set, and [the victim] was trapped. [The defendant] left through the front door of building one, making sure to disguise himself, while [the victim] struggled and crawled to get help for himself . . . ."

As the foregoing demonstrates, the prosecutor asked the jury to draw several inferences based on the evidence. The locations of the spent casings and the bullet holes in the walls, coupled with the condition of the victim's clothing, support the reasonable inferences that the victim was naked and kneeling when the shooter fired at the victim from the landing above him. Given that positioning, it also would be reasonable to infer that the defendant wanted to humiliate the victim by forcing him to remove his clothes and that the victim may have been "begging for his life" when he was naked and looking up at the person who was about to shoot him. Moreover, such inferences are relevant to whether the defendant intended to cause the victim's death, which was a critical issue in the case, as it is the element that distinguishes murder from the lesser included offenses of manslaughter in the first and second degree with a firearm, on which the jury also was instructed. See, e.g., *Oppel* v. *Lopes*, 200 Conn. 553, 558, 512 A.2d 888 (1986). Accordingly, because the prosecutor marshaled the evidence presented at trial to persuade the jury to draw reasonable inferences in the state's favor, her remarks that the victim was "forced at gunpoint to strip" to humiliate him and that the victim was "on his hands and knees" and "begging for his life" when he was shot were not improper.

For the same reasons, the prosecutor's arguments that the defendant "lured" the victim into the stairwell

and "set a trap" for him also were not improper. The video evidence supported such an inference, as the defendant frisked the victim before leading him away from the group of people in the school parking lot and into a maintenance stairwell in Greene Homes. The defendant appears to look back at the victim at various points during the walk, indicating that he knew the victim was only a few paces behind him. Because of that evidence, it is reasonable to infer that the defendant "lured" the victim to a secluded location to kill him. Consequently, the prosecutor's comments were supported by reasonable inferences drawn from the evidence and relevant to the charged offense.

## C

Finally, the defendant claims that the prosecutor improperly appealed to the emotions and passions of the jurors when she "weaponized gratuitous, graphic details of the crime to elicit the sympathies and [to] inflame the passions of the jurors." We disagree.

The defendant first argues that the prosecutor's "comments that [the victim] was 'forced at gunpoint to strip . . . to humiliate him,' that [the victim] was 'on his hands and knees or on the ground' 'begging for his life' when he was shot, and that [the victim] was 'lured' into a 'trap' set by [the defendant]" "are wholly unsupported by the evidence presented at trial" and "served only one purpose: to arouse sympathy for [the victim] and animosity against [the defendant]." Not only were these remarks based on the facts in evidence; see part III B of this opinion; but they also were relevant to the defendant's intent to cause the victim's death and, thus, were not improper appeals to the passions and prejudices of the jurors.

Next, the defendant argues that the prosecutor's frequent references to the victim's nudity throughout closing and rebuttal arguments "[lack] any relevance to

the elements of the [charged offense]." Given that the victim was found naked in the basement stairwell and that a bystander covered the victim's midsection with a towel before the police arrived, the victim's nudity simply was a salient fact in the case. As we have observed, "[a] prosecutor is not precluded from using descriptive language that portrays the nature and enormity of the crime when supported by the evidence. Thus, to the extent the prosecutor's language appealed to the jurors' emotions, it did so because of the nature of the crime and not because of the terminology the prosecutor used to get [her] point across." *State* v. *Andrews*, 313 Conn. 266, 301, 96 A.3d 1199 (2014). Additionally, as we explained previously in this opinion, the reasonable inference that the defendant made the victim remove his clothing before shooting him is relevant to the intent to cause the victim's death. Therefore, the prosecutor's references to the victim's nudity were not improper.

Last, the defendant argues that the prosecutor "improperly emphasized the graphic details of [the victim's] descent into the basement and to the rear door of building one. The [prosecutor] repeatedly emphasized . . . how [the victim] dragged himself seventy-five feet while bleeding to death with a shot in his head. . . . Such explicit focus on what [the victim] did after the fatal shots were fired has no bearing on whether [the defendant] intended to cause, and did cause, [the victim's] death." (Citation omitted; internal quotation marks omitted.) This argument is unavailing because the victim's movements after the fatal shots were fired were relevant to demonstrate that the defendant was the shooter.

The defendant was seen leaving the front entrance of building one approximately one minute before the first 911 calls were made around 4:30 p.m., and the responding officers who arrived minutes later did not find the victim. The victim was found at the bottom of

the exterior stairwell nearly forty-five minutes after the first call. During closing argument, defense counsel highlighted the fact that the police did not find the victim or any evidence of a crime during their initial response and argued that that was "the fatal flaw to the state's case." In rebuttal, the prosecutor described the victim's movements to explain why it took him forty-five minutes to descend the stairs and to cross the basement floor after being shot. The challenged comments regarding the victim "dragg[ing] himself seventy-five feet while bleeding to death" also were directly connected to relevant evidence in the record, as LaMaine testified that the basement floor looked like it had been "mopped" with blood and that there were bloody handprints on the doorframes near the floor, indicating that the victim was dragging himself across the floor and through the doorways as he made his way to the exit. The video footage of the crime scene confirmed that description. Consequently, the prosecutor's remarks were graphic because of the nature of the crime and were relevant to defense counsel's closing argument. Therefore, they were not improper.

## IV

The defendant's final claim is that the trial court erred in giving the jury a consciousness of guilt instruction over defense counsel's objection. Even if we assume, without deciding, that such an instruction should not have been given, we nevertheless conclude that the defendant was not harmed. Therefore, we reject the defendant's claim.

The following additional facts and procedural history are relevant to this claim. During the charging conference, the prosecutor requested a consciousness of guilt instruction based on the footage of the defendant putting a mask over his face as he exited building one and his flight to Florida after being interviewed by the

police. The trial court agreed to give the instruction: "I do think there is evidence to support both of those. The defendant was arrested in Florida, and we quite clearly see in the raw footage the defendant putting a [Halloween] mask [over] his face when he walks out of the building. I read a bunch of case law on this, and even changing one's shirt is sufficient to warrant this— well, the flight definitely, but even the changing [of] one's appearance."

Defense counsel objected to the instruction: "[W]e would object to consciousness of guilt as it relates to the appearance, as the evidence would show [the defendant] admitted to walking out the front door of . . . Green Homes. And, secondly, as to flight, while . . . there was testimony from . . . Winkler, I believe, that [the defendant] was arrested in Florida, there was not evidence of flight per se." The trial court disagreed and concluded that "changing one's appearance or flight, when unexplained, may indicate consciousness of guilt if the facts and the circumstances support it."

During closing argument, the prosecutor briefly referenced the consciousness of guilt evidence when discussing testimony in the case. Specifically, she argued: "The . . . fugitive task force had to be called in to locate [the defendant]. One year later, one year after this murder, he was found . . . in Florida. He had to be extradited back from Florida, and [two detectives] had to go to Florida and bring him back to Connecticut to answer to the charge of the murder of [the victim]. The court will tell you that you may consider the fact that [the defendant] fled to Florida as consciousness of his guilt, and I ask you to do that." She continued: "I submit to you that [the state has proven the elements of murder] based on [among other things] the fact that he fled to Florida after there was a warrant for his arrest."

During rebuttal argument, the prosecutor again argued that "[y]ou may consider consciousness of guilt [based on] the fact that [the defendant] put on a mask as he was leaving the building. This was well before COVID. It wasn't a medical mask. This wasn't a COVID mask. The inference can be drawn that this mask was being placed on his face to avoid detection. He wanted to change his appearance. You may also consider his flight to Florida as consciousness of guilt, and I submit that you do that." She continued: "I submit to you . . . [that the defendant] is the last person to see [the victim] alive. [The defendant] checks [the victim] for a gun to make sure he's unarmed. He's not forthcoming in his interview. He puts a mask on to change his appearance. He runs from the scene. He flees to Florida."

After closing arguments, the trial court provided the following instruction to the jury: "In any criminal trial, it is permissible for the state to show that conduct or statements made by a defendant after the time of the alleged offense may have been influenced by the criminal act, that is, the conduct or statements show a consciousness of guilt. For example, changing one's appearance or flight when unexplained may indicate consciousness of guilt if the facts and the circumstances support it. Such acts do not, however, raise a presumption of guilt. If you find the evidence proved and find that the acts were influenced by the criminal act and not by any other reason, you may, but are not required to, infer from the evidence that the defendant was acting from a guilty conscience.

"The state claims the following conduct is evidence of consciousness of guilt: the defendant's changing his appearance, and the defendant's flight to Florida. It's up to you as judges of the facts to decide whether the defendant's acts, if proved, reflect consciousness of guilt and to consider such in your deliberations in conformity with these instructions."

The following legal principles guide our analysis. To begin with, consciousness of guilt evidence is admissible. "In a criminal trial, it is relevant to show the conduct of an accused, as well as any statement made by him subsequent to the alleged criminal act, which may fairly be inferred to have been influenced by the criminal act. . . . Generally speaking, all that is required is that . . . evidence [of consciousness of guilt] have relevance, and the fact that ambiguities or explanations may exist [that] tend to rebut an inference of guilt does not render [such] evidence . . . inadmissible but simply constitutes a factor for the jury's consideration. . . . The fact that the evidence might support an innocent explanation as well as an inference of a consciousness of guilt does not make [the admission of evidence of consciousness of guilt] erroneous. . . . Moreover, [t]he court [is] not required to enumerate all the possible innocent explanations offered by the defendant. . . . [I]t is the province of the jury to sort through any ambiguity in the evidence in order to determine whether [such evidence] warrants the inference that [the defendant] possessed a guilty conscience." (Citations omitted; internal quotation marks omitted.) *State* v. *Coccomo*, 302 Conn. 664, 669–70, 31 A.3d 1012 (2011). And, once such evidence is admitted, there is no question that the prosecutor can refer to it during closing argument.[26] Thus, the only issues raised by this claim are whether the court properly charged the jury on consciousness of guilt and, if not, whether the defendant was harmed.

We previously have held that "[t]he decision whether to give an instruction on flight, as well as the content of such an instruction, if given, should be left to the sound discretion of the trial court. . . . We review the

[26] The defendant argues in his supplemental brief: "Both parties should have been left to argue what reasonable inferences could be drawn from the evidence during summation, without the court's emphasizing only one view in its instructions."

defendant's claim under this standard." (Internal quotation marks omitted.) *State* v. *Scott*, 270 Conn. 92, 104, 851 A.2d 291 (2004), cert. denied, 544 U.S. 987, 125 S. Ct. 1861, 161 L. Ed. 2d 746 (2005). "[C]onsciousness of guilt claims are not constitutional in nature." *State* v. *Thompson*, 305 Conn. 412, 446, 45 A.3d 605 (2012), cert. denied, 568 U.S. 1146, 133 S. Ct. 988, 184 L. Ed. 2d 767 (2013). Consequently, when the defendant claims that he was harmed by an improper consciousness of guilt instruction, it is his burden "to demonstrate that it is reasonably probable that the jury was misled" by the erroneous instruction. *State* v. *Hinds*, 86 Conn. App. 557, 568, 861 A.2d 1219 (2004), cert. denied, 273 Conn. 915, 871 A.2d 372 (2005).

The defendant argues that "[t]his was a weak and circumstantial case" and that "the instruction unfairly emphasized the evidence consistent with the defendant's guilt." We are not persuaded.

The state had a strong case against the defendant apart from any inference that he engaged in conduct reflecting a guilty conscience after the crime was committed. The state relied on surveillance footage from the day of the murder that showed the defendant approaching the victim, patting him down, and then leading him to Greene Homes, where the victim's body was later found. The footage also showed the defendant leaving the complex alone, minutes after the shooting. The jury also heard LaMaine's testimony that, due to the layout of the building, there would have been "no way [for the defendant] to get from where he's last seen on video going into the building to exiting the front door without walking by where the crime occurred." Additionally, police officers, when executing a search warrant at the defendant's home, found ammunition that matched shell casings discovered at the scene of the murder, and a gun wrapped in a dark sweatshirt, which matched what the defendant was wearing in the

surveillance footage. Robinson testified, to a reasonable degree of scientific certainty, that the gun found in the defendant's bedroom, which the defendant admitted to purchasing, was the murder weapon. It is evident that, although the defendant's actions after the murder may have been consistent with his guilt, the state's case largely relied on surveillance footage, evidence from the scene of the crime, and the testimony of various witnesses. Therefore, we are not persuaded that the jury likely was misled by the trial court's consciousness of guilt instruction.[27]

The judgment is affirmed.

In this opinion the other justices concurred.

---

[27] The defendant additionally claims that this court should exercise its supervisory authority to abandon the use of consciousness of guilt instructions in our courts. Given our conclusion that the defendant was not harmed by the consciousness of guilt instruction in the present case, we leave that question for another day. See, e.g., *State* v. *Thompson*, 305 Conn. 412, 439 n.8, 45 A.3d 605 (2012), cert. denied, 568 U.S. 1146, 133 S. Ct. 988, 184 L. Ed. 2d 767 (2013).